HALE S. COOK v. FLORENCE COOK BRANINE, Appellant.—107 S. W. (2d) 28.

Division One, June 30, 1937.*

---

*NOTE: Opinion filed at September Term, 1936, April 21, 1937; motion for rehearing filed; motion overruled at May Term, 1937, June 30, 1937.

274

*Carlos W. Evans* for appellant.

*Gossett, Ellis, Dietrich & Tyler* for respondent.

FRANK, P. J.—Action by respondent, plaintiff below, to set aside two deeds executed by respondent to appellant, and to quiet the title to an undivided one-fourth interest in the real estate in question in respondent. The decree below was for respondent and the case is here on appeal.

Kate S. Cook died testate in Kansas City, Missouri, on November 11, 1928, leaving four children surviving, two sons and two daughters. By the terms of her will she devised her property to her children in four equal undivided shares, one-fourth to a son, Dr. Ward H. Cook, one-fourth to a daughter, Lydia Cook Smithmeyer, one-fourth to respondent, Hale S. Cook, and one-fourth in trust for the use and benefit of appellant, Florence Cook Branine, during her life and at her death to her children. Respondent, Hale S. Cook and the Fidelity National Bank were named in the will as trustees to administer said trust.

Two properties are involved in this action. One located at 3109-3111 Gillham Road in Kansas City, improved with a two-story brick building built for an auto sales agency and service department. The other property is located at the northwest corner of Twelfth and Forest Avenue in Kansas City. Deceased, during her lifetime, owned a $9000 note secured by a mortgage on this latter property. This $9000 mortgage note was a part of the assets of deceased's estate which was devised to the children by her will. After her death the mortgage securing the $9000 note was foreclosed. The property was purchased for the estate and by agreement of all parties title was taken in the name of appellant, Florence Cook Branine, with the understanding that the property belonged to the heirs of the estate. At the time appellant took title to the property she executed a deed thereto in blank to respondent.

Respondent, Hale S. Cook testified, in substance, as follows:

"I was executor of my mother's estate. After my father's death I looked after the properties, and continued to do so after my mother's death until my health prevented it in the late fall of 1932. I was given power of attorney by sister Lydia and my brother Ward. I had my own interest and I was trustee for my sister Florence. I have been engaged in the real estate business in Kansas City about five years. When my health broke in 1932, my mental condition was terrible. I had suicidal tendencies. At this time my sister Florence was working for Dr. Cooper—had charge of his outer office. She had been working for him for several years. I went to Dr. Cooper for treatment and became his patient. At that time I had no money and so told Dr. Cooper. He told me that he expected me to pay him when I got able, but if I did not earn the money I need not worry about it. The doctor never gave me a statement of my account.

"Both Dr. Cooper and my sister told me that in my condition I should have nothing to do with the management of the properties, but should leave that matter to Florence. My sister called me to Dr. Cooper's office and asked me to deed the Twelfth and Forest property to her, like it was before. I went over and prepared a deed, signed and acknowledged it and brought it back to her. She did not indicate to me that I was conveying the ownership of the property to her. As far as she said—putting it back the way it was before; that she was looking after the family's property, and I understood it to mean that she was looking after it for the estate. She did not pay me anything for the property. She did not say anything about me owing her any money. She did not tell me that she had guaranteed any bill to Dr. Cooper. I never heard of such a claim until I read her deposition. She took everything out of my hands when I went as a patient to Dr. Cooper. My mind was in no condition to handle anything and she told me on several occasions that she was handling the property for me and would handle it for me. She gave me to understand that she was handling it for the estate. I made the deed to her on March 30, 1933, and she has never paid one cent for it. I brought the suit because she was claiming absolute title to both properties.

"I owned an undivided one-fourth interest in the other property known as Gillham Road property. On July 7, 1933, my sister called me to Dr. Cooper's office and asked me to deed my undivided one-fourth interest in this property to her. She had the deed already prepared and asked me to sign it. I told her I did not think I should do it—that I owed my brother and my other sister some money and that I felt that they had a claim on this one-fourth interest over and above hers. She kept insisting. Dr. Cooper was in the office looking at me and listening to what I said. I was objecting to giving her title to the property and not protecting Ward and Lydia. She

had not paid me any money. She mentioned how good she had been to me. She had never told me she expected to make a charge for being good to me. I understood Dr. Cooper was going to charge me if I was able to pay it. I was still refusing to sign the deed. I thought I should protect Ward and Lydia in the property. I hesitated to give the deed because at that time I knew that negotiations were under way for a new lease with the present tenant, and I did not have confidence in Florence's ideas in regard to that tenant. It seemed to me like she was driving them out of the building rather than make any effort to hold them as tenants.

"Dr. Cooper said to me that if I did not give my sister that deed he would be through with me forever, and his remarks led me to believe that my mind would suffer as it had suffered before if I left his treatments. He seemed rather threatening to me. I was frightened. My mind was not functioning when I went to Dr. Cooper. I wish I could recall the exact words. I do recall that he said he would be through with me, and I recall he said, 'When I am off of people they suffer.' As a result of that I said, 'All right. I will give it to you, Florence, but I want you to be careful.' She told me before this that if I would deed this property to her she would give it back to me at some future time. Knowing that she had said that, and believing that she was handling the affairs of my brother and other sister, I said, 'All right.' I would not have signed that deed except for what Dr. Cooper said to me. I was his patient at that time. He was giving me mental treatments. I tried to put myself entirely in his charge. I was recovering. I continued as his patient for a short time thereafter.

"When I asked her questions about the property she would advise with Dr. Cooper before answering me. Her relationship with Dr. Cooper seemed to me to be very close. I made a demand for the return of the property and she refused. She never paid me anything for this property, and made no claim that anything had been paid on my account for it. I never heard of such a claim until I read her deposition. I have been in the real estate business some five years, have handled some property in the vicinity of the Gillham Road property, and feel that I have an opinion as to the reasonable value of the Gillham Road property. A conservative appraisal of that property would be $36,000. The first National Bank has a mortgage on it for $18,000. It had been rented for $500 per month and is now rented for $375 per month. I base my appraisal of this property on what property in that vicinity sold for within the last four months. It was regarded as worth in excess of $50,000 in normal times. I never received anything for my one-fourth interest in this property."

Appellant testified in her own behalf, in substance as follows:

"On July 7, 1933, I called my brother to Dr. Cooper's office. I said to him, 'Hale, considering all the invaluable things I have done for you I think you should deed this property to me.' I said, 'I have done more for you than any one else and I feel you should deed this property to me.' Hale said, 'Well, now I will have to think this over—there are several angles to this case.' I then mentioned all that I had done for him and persuaded him to deed the Gillham Road property to me. I saved his life at the time of his nervous breakdown in November, 1932. He was badly depressed and suicidal. I calmed and quieted him and finally persuaded him to give me a bottle of chloroform that he got for the purpose of suicide, and he was very grateful and considered it a very valuable service. I persuaded him to go to Dr. Cooper who is a competent specialist, which resulted in his regaining his mental and nervous health, and he is just as sane as any body today because I persuaded him to go to Dr. Cooper. He was penniless at the time and was not in any condition to be worrying about such things, and I guaranteed his bill and am still guaranteeing it. I told him that I had paid $245 on his bill. I did a lot of work for him. I did some office work for him for which he received the pay. I reminded him that I had paid some of his debts. I am the one that advised him to pay his debts. They would not be paid today if I had not persuaded him to pay them. I intend that they shall be paid. I intend to pay his debts out of the income from that share of the property. I felt that it was a moral obligation that they be paid. I am an honest woman and have been and will always be. He had been dissipating his property as fast as he could. I felt that if he retained ownership in that property there would be nothing left to pay his debts. I thought it was much better for him to give it to me for the services I had performed. The property would have been gone if I had not stepped in and saved it for all of them. I gave him money for food when he was penniless and hungry. I reminded him that I had saved his reputation. I did save his reputation by persuading a certain party not to make slanderous remarks about him. Dr. Cooper did not say to Hale the things which Hale testified he did say.

"When Hale handed the deed to me he said, 'I give this to you freely and willingly.' He said it twice. I had not suggested that he say that. No one suggested that he say it. I asked him to give me the deed to keep him from squandering his money and wasting it in dissipation as he had done in the past, so that it could be used to pay his debts to Lydia and Ward and myself and others that I know. At first he would not agree to make the deed, but after I reminded him of these things he did it gladly and proudly. When I took the deed the property was mine and it is mine now. I gave

him invaluable consideration for it. No amount of money could pay for the things I have done for Hale. He told me he would not have brought this suit if his lawyer had not put him up to it. Out of the income from this property I intend to pay some of Hale's debts as I see fit in my opinion. I told Hale on the day the deed was made that I intended to charge him for the things I had done for him. I would have done these things for him if he had not had a penny. I gave Hale $15.00 with which to buy food. I asked him after the deed was made to pay this $15.00 back to me. He paid me five dollars.

"I paid $245 to Dr. Cooper on Hale's bill. I agreed to pay the balance but made no written promise to pay it. I told Hale that in view of all the services I had performed for him it was little enough for him to do to pay me by deeding that property to me. I saved his life when I took the chloroform away from him. That is a very valuable service and I expected to charge him for it. I am charging him for advising that he go to the doctor. I thought he owed an awful lot."

Dr. Cooper testifying for defendant, said in substance, the following:

"I am a regularly licensed physician. I limit my practice to nervous and mental diseases. Hale Cook became my patient in November, 1932. I treated him for insanity. He recovered from his insanity but he is somewhat nervous. I was in my office when his sister called him to the office. I overheard a conversation between them. She asked him to give her the property on Gillham Road. When she first asked him he refused. She reminded him of the valuable services she had rendered him. He said there were several angles to the proposition. He refused for a while but finally agreed. I heard him say at the time he agreed to give her the property, 'I give this freely and willingly. . . . I never again want any ownership in that property.' I asked him why and he said, 'Because it has brought me nothing but grief.' Nothing was said about her ever returning the property to him. I said, 'Hale, considering that you were insane and in the gutter and dissipating your and your brother's estate and that she has befriended you in every way, that she helped to get you to me and restore your reason and save your life, she fed you when you were hungry, and she has been even and more than a good sister would be, and knowing as you know her good intentions, I am utterly displeased and disgusted that you refuse to do the fair and right thing in this matter.' I know she encouraged him in every right doing. I know that she has been very ambitious for his good name—to protect his good name. I know that she has urged him to be honest and truthful. I know that she has

been everything that a good sister should be. More than an average sister I would say.

"Shortly after I talked to him he agreed to sign the deed and said with a very satisfied tone of voice, 'I give you this freely and willingly.' I did not threaten him but I did urge him to give his property to his sister. I did not act or talk in a threatening manner but I had a disgusted attitude because he would not do it, and I let him know that I was thoroughly disgusted."

Appellant cannot successfully contend that the deeds in question are supported by a monetary consideration. She testified on direct examination that she furnished him money when he was hungry, and paid $245 on his bill to Dr. Cooper. On cross-examination she admitted that she furnished him only fifteen dollars, and after she got the deeds to his property she demanded that he pay her the fifteen dollars, and he paid her five dollars of it. She further admitted that she had not agreed in writing to pay his doctor bill. Not having agreed in writing to pay the bill she is not legally liable therefor. Her testimony on re-direct examination shows that she is not relying on a monetary consideration to support the deeds to her. She testified:

"Q. Was it the money you had loaned to him or rather the service you had done? A. Certainly money could not pay for the things I have done for Hale and he knows it."

A court of equity will not lend a listening ear to a sister who claims that an unfortunate brother should give her all of his property on the theory that she saved his life by taking a bottle of chloroform from him to prevent his suicide; that when he was insane she restored his reason by advising him to go to a doctor for treatment; that she saved his reputation by persuading certain persons not to slander him, and that she advised him to pay his debts and live an honest and upright life. Any good citizen would do that much for a stranger without hope or expectation of reward. It is apparent without further discussion that such sisterly acts do not furnish a consideration for the deeds in question.

Was there a monetary consideration for the deeds? The general rule governing a like situation is well stated in Watkins, Admrx. of Allen's Estate, v. College, 41 Mo. 303, 309, as follows:

"So too, as a general proposition, no man can make himself the creditor of another by any act of his own unsolicited and purely officious. There must be a previous authorization either express or implied, or an assent or sanction given after the money is paid or the act done. If a plaintiff volunteers a payment on account of a defendant without any authority or request express or implied, the defendant is not obliged to reimburse him. . . . And where a party voluntarily does an act, or renders service, and there was no

intention at the time that he should charge therefor, or understanding that the other should pay, he will not be permitted to recover, for that which was originally intended as a gratuity cannot be subsequently changed into a charge. . . . And whether it was intended as a gratuity, is a question of fact."·

In the case at bar there was no evidence of an agreement that appellant should pay or guarantee respondent's doctor bill. There was substantial evidence that respondent did not know that appellant had guaranteed the payment of his doctor bill or that she had paid any part thereof until she so testified in her deposition taken in this case. There was some evidence on the part of appellant from which it could have been legitimately inferred that after respondent learned that appellant guaranteed his doctor· bill and paid a part thereof, that he ratified appellant's act in so doing, but there was substantial evidence to the contrary, and the conflict in the evidence on that issue presented a question of fact for the chancellor below to determine. While his determination of that question is not binding on us, we have discovered no reason for disturbing his finding on that issue. We theretofore hold that there was no monetary consideration shown for the deeds in question.

Appellant contends that there is no substantial evidence that the deeds were procured from respondent·by duress or undue influence.

█ In our view of this case we need not determine this contention. It is settled law that where a deed is made without consideration and without intention to convey the absolute title in fee to the grantee, on refusal of the grantee to return the property to the grantor upon his demand, equity will intervene and grant relief. In the case of Mentzer v. Mentzer et ux., 325 Mo. 941, 30 S. W. (2d) 146, 148, we said:

"Plaintiffs in error misconceive the case when they assume that the judgment must rest solely upon the ground of want of consideration for the deed. There was ample evidence from which the court could, and as above indicated did, conclude that the grantor never intended by this conveyance to give the property described in the deed to the grantees named therein, and hence no title passed. Their refusal to return the property to plaintiff on his demand under the circumstances in evidence warranted equitable intervention."

In the case at bar there was substantial evidence that there was no consideration for the deeds, and that respondent never intended by said deeds to give the property described therein to appellant. Such showing, independent of the question of undue influnce or duress, brought the case within the rule announced in Mentzer v. Mentzer et ux., supra, and authorized the cancellation·of the deeds.

█ Further contention is made that respondent did not come into a court of equity with clean hands.

282

The argument made in support of this contention is that when respondent held title to the property for the benefit of the heirs, he placed a loan thereon, the proceeds of which he appropriated to his own use.

A sufficient answer to this contention is, (1) that the evidence shows that he made this loan with the knowledge and consent of all the heirs, including appellant, and (2) that his undivided one-fourth interest in the property was more than sufficient to pay the loan.

The decree below should be affirmed. It is so ordered. All concur, except *Douglas, J.*, not voting because not a member of the court when cause was submitted.