Mary Genevieve PHELAN, also known as Genevieve Phelan, Plaintiff (Appellant),

v.

Dora Catherine GOCKEL, Henry W. Gockel, and Regina Strauss, Defendants (Respondents).

No. 44212.

Supreme Court of Missouri.

Division No. 1.

April 11, 1955.

Motion for Rehearing or to Transfer to Court en Banc Denied May 9, 1955.

M. J. Doherty, William Kohn, St. Louis, for appellant.

Robert S. Kilker, Dubail & Judge, St. Louis, for respondents Gockel.

VAN OSDOL, Commissioner.

This is an appeal from a judgment in favor of defendants rendered in plaintiff's action in equity to cancel three conveyances of described real estate in Richmond Heights, St. Louis County. Herein plaintiff-appellant contends the trial court erred in rendering judgment for defendants.

The real estate involved consists of a fractional lot with a two-story residence thereon. It is sometimes referred to as the "Wise" property. It is said to have been of the reasonable market value of $8,500 in 1950.

By a quitclaim deed dated March 29, 1950, plaintiff conveyed the described property to defendant Regina Strauss, a straw party. On the same day, March 29th, Regina Strauss executed a quitclaim deed to plaintiff Genevieve Phelan and defendant Dora Catherine Gockel. This deed recited the consideration of one dollar and "other good and valuable considerations." Both of these deeds were filed for record April 3, 1950. The habendum clause of the latter deed was as follows,

"To Have and to Hold the Same, together with all rights, immunities, privileges and appurtenances thereto belonging unto the said Genevieve Phelan, for and during the term of her natural life, with power in her to use, occupy and enjoy the same and to collect the rents and income therefrom for her sole and exclusive use and benefit, and with the further power, which is hereby expressly conferred upon her, during her lifetime, to sell, convey the fee simple title, convey by gift, or to in any other manner dispose of the whole or any part of said premises, and to rent or lease the same, or any part thereof, for any period she may choose, and to take full possession of the proceeds of any such sale, rental or mortgaging, with full right of use, encroachment upon or disposition of such proceeds, all in her sole discretion and by her sole deed or other instrument, and with remainder, at her death, as to any part undisposed of by her in her lifetime under the powers herein conferred, to said Dora Catherine Gockel, and to her heirs and assigns, absolutely and forever."

July 21, 1950, plaintiff executed a quitclaim deed to defendant Dora Catherine Gockel which conveyance also contained the recital of a consideration of one dollar and other good and valuable considerations, and the further recital that it "is the object and purpose of this instrument to release any right, title or interest which party of the first part (plaintiff) in this deed may have in and to above real property by way of life tenancy or by way of powers granted to her by said instrument (the instrument referred to being the conveyance of March 29th from Regina Strauss to plaintiff and defendant Dora) * * *, so that party of the second part in this deed, from this day forth shall have title to above described property free and clear of any title or interest granted to party of the first part in this deed, in and by said instrument (of March 29th) * * *." This third conveyance was filed for record July 27, 1950.

Plaintiff alleged the instruments were executed while she was seriously ill and that defendants, being in a confidential and a fiduciary relationship to her, took advantage of the trust and confidence which she, plaintiff, reposed in them, particularly in the defendant Dora Catherine Gockel, and by entreaties and overpersuasion and false representation and, by taking advantage of plaintiff's old age, sickness and mental and physical weakness, "did unduly influence, induce and cause plaintiff to execute and deliver" the questioned conveyances.

Plaintiff testified she was born June 17, 1870, so she was approximately eighty years old when the three conveyances were executed. She had never married and had lived alone in the described property since she purchased it in 1921. She was a teacher in the public schools of St. Louis for forty-seven years, her service as a teacher having terminated in 1944. Her health "is pretty fair now (at the time of trial in 1953) for my age," and her memory is "very good for one of my age. Little things around the house, I put things out of my hands and don't remember where I put them, but things that count, I can remember pretty well."

Defendants Henry W. and Dora Catherine Gockel, husband and wife, are engaged in the laundry business. They are the parents of two adopted children. We infer defendant Dora was forty-seven years old in 1950.

Plaintiff had become acquainted with defendant Dora in 1927. They became close friends; visited in each others' homes; went to places of entertainment; participated in family gatherings; and shared holidays together. Plaintiff was one of the godparents of defendants' adopted children. Plaintiff has no near relatives. She has a number of cousins, but they are not "close"

cousins—they are "second, third, and fourth."

Plaintiff had become ill with intestinal influenza February 23, 1950. This illness lasted three or four weeks, during which time she was bedfast and was cared for by defendant Dora at the Gockel home. Plaintiff sustained a fracture of her ankle sometime in October, 1950. She wore a cast for about two months. She was cared for by defendant Dora at the Gockel home. Plaintiff was stricken with virus pneumonia, in early January, 1952, and was confined to a bed in the Gockel home for about four weeks. And, again in August, 1952, plaintiff suffered a gall-bladder attack. She was in the hospital for twenty-three days, and was later at the Gockel home for about ten days. Plaintiff testified she and defendant Dora were "very, very close friends and always I introduced her as my very best friend. She had been good to me when I was ill. * * * I first had intestinal flu, and then I got over that and broke an ankle and got over that and had that virus pneumonia, and the next time I was sick I went to St. Mary's hospital with gall-bladder trouble." During the various times plaintiff was ill at the Gockel home, defendant Dora attended to all of plaintiff's needs including the administering of medicines, the preparation of meals, and personal care and laundry. Defendant Dora was very kind to plaintiff. Plaintiff was rather disappointed, however, with the attention given her by defendant Dora while plaintiff was convalescing in the Gockel home in August or September, 1952. "I was charged for some of the food I ate there." And she thinks she was charged for some food she didn't eat.

Plaintiff testified of the first conversation she had with defendant Dora concerning a disposition of the described property. We infer the time was during or after her sickness of February and March, 1950. "I was lying on a cot, and she was combing her hair, and I remember saying to her, 'Dora, you always wanted and always liked the house, my house,' and I said, 'You asked for the first refusal if I sold it. I am thinking of leaving it to you.' Not giving it, but, 'leaving it to you.' * * * Well,

she was flabbergasted, you might say. She was delighted." At that or at some subsequent time (possibly when plaintiff was making her will sometime in the summer of 1950) a further conversation occurred— "Let me see. There was something there. I was making out my will, and she (defendant Dora) said, 'Don't put that in any will. I don't like to go through probate,' and I said, 'What will I do?' She said, 'Give it to me outright,' so when I did go to the lawyer I was under the impression that it was to be given to the survivor, but it did not turn out that way."

The two conveyances of March 29, 1950, were executed by plaintiff at the offices of a real-estate firm in the City of St. Louis. The acknowledgments were taken by Mr. James H. Zipf, an attorney. At one time during her testimony plaintiff stated Mr. Zipf was her attorney. Plaintiff said that after the conveyances of March 29th were signed, defendant Dora "was delighted. We went over together and had lunch. * * * I thought everything was straight as I wanted it to be, to the survivor, but I had never seen the deed to read it myself. It was read to me, and I can't get anything read to me as clearly as if I had the paper in my hand." Defendant Dora continued to be plaintiff's "best friend" until sometime in October, 1952, when, according to plaintiff, she again saw but first examined the three conveyances.

The (third) conveyance of July 21, 1950, was also signed by plaintiff at the office of Mr. Zipf, who took plaintiff's acknowledgment. Plaintiff testified of the occasion when this conveyance was signed, "I think I remember that visit very, very well, but it had more to do with the money that I should pay for a gift tax than it did for this instrument." Plaintiff testified Mr. Zipf was uncertain as to whether a gift tax was entailed. Plaintiff could not say that Mr. Zipf actually explained the legal effect of this deed to her because he "took so much time to tell me, by the time I got through I did not know what he was talking about." On cross-examination, plaintiff was asked the questions, "Well, now this gift tax had

to be made because of this Plaintiff's Exhibit C, this deed (of July 21st), which conveyed the property fully to Mrs. Gockel, is that correct? It was thought necessary for that reason, is that correct?" Plaintiff answered, "Yes." At or near the time, an insurance contract on the property was canceled, and plaintiff remembers that she later received the returned, unearned portion of the premium.

July 13, 1950, plaintiff had executed a power of attorney authorizing defendant Dora to have access to plaintiff's safe box in the vault of the Mississippi Valley Trust Company. Defendant Dora entered the safe box many times when plaintiff needed money and wanted notes collected. Plaintiff testified, "Yes, I gave her the key to the box, a key, and then she said, 'you have got your money there for your funeral expenses.' I said, 'Yes.' She said, 'You know if you die, the box will be locked,' and which I know to be true—'and I could not get it.' She was also my executor, so I said, 'All right. What do you want me to do with it?' She said, 'Put it in our box.' So I did that. I would have trusted them to the end of the world, both of them, man and wife."

Plaintiff had entered into an agreement with an undertaker, Mr. Alphonse Bocklage, by which agreement, in consideration of the payment (at plaintiff's death) of the sum of approximately $980, the undertaker was to render appropriate funeral and burial service. The stated amount of money, in cash, was contained in an envelope in plaintiff's safe box at the Mississippi Valley Trust Company. As we have noted supra, plaintiff testified she permitted the money to be transferred to a safe box of the Gockels. Later, in the fall of 1952, plaintiff demanded the return of this money and was advised by the attorney, Mr. Zipf, that this money did not belong to her. He said it belonged to the undertaker "after you are dead * * *." It seems that defendant Dora had been designated as trustee to hold the money until the death of plaintiff. On a subsequent occasion, perhaps in early 1953, Mr. Bocklage and plaintiff signed "a piece

of paper" and the money was returned to plaintiff.

Mr. John J. Degnan, an attorney, was called to the Phelan home some time during the summer months of 1950. He was actually brought "into this matter" by Mr. Bocklage, the undertaker. Mr. Degnan testified that he was at the Phelan home on two or more occasions. His first call was in the evening. Plaintiff wanted to make a new will and each provision and bequest was listed and discussed with her. Defendants Henry and Dora Gockel were present and also Mr. Bocklage. Plaintiff told the witness how she wanted the will prepared, "and then the question came up with reference to the home which she stated that she wanted to give to Mrs. Gockel, but she did not want it to become a part of the estate, * * *. And then * * * she wanted a certain amount of money held in trust for her funeral bill, that she had entered into a contract for her burial with the Bocklage funeral home, and she * * * didn't want the funeral bill handled through the Probate Court." The witness was shown the deed from plaintiff to Regina Strauss, and the deed from Strauss to plaintiff and defendant Dora. A question arose in the mind of the witness as to whether or not the last-mentioned conveyance was testamentary in character, and another attorney was brought into conference. They came to the conclusion "that it was not testamentary—that it was a deed." The plaintiff questioned whether or not "she would have to move from her property, her home, rather, and was it safe and things of that character which in our opinion we so advised her that she had a life estate and she could dispose of it whenever she wanted to during her life but at her death, * * * automatically the title vested in the remainderman which was Mrs. Gockel. * * * Miss Phelan was a little excited, and we all tried to appease her and tell her not to get excited, she had nothing to worry about and Mrs. Gockel told her the same, it was her home as long as she would live and would not disturb her, in fact, could not disturb her." The witness was asked if he had theretofore seen the deed of July 21, 1950,

and answered, "I cannot say definitely one way or the other." As stated, these conversations were in the summer of 1950, "I would say, June, July, and maybe August."

Another matter came up for discussion at these conferences. It concerned plaintiff's furniture and household appliances. Plaintiff said she did not want the house and household goods to go through probate. She wanted defendant Dora to have the house and all the furnishings at the time of plaintiff's death. A list of the major items of personalty was made up by plaintiff and given to the witness who prepared a bill of sale, "I would say three or four or five months afterwards. And I made it and then I sent it down to Mrs. Gockel and she was going to have Miss Phelan sign it and have it notarized and she was going to keep it until Miss Phelan died and then it would immediately become her property and would not go through probate and the house would be hers."

Plaintiff testified concerning the bill of sale—"We were told that even though the Gockels would be the owner of my property after I died that they could not get in the house as long as there was furniture there, so I had to make out an inventory and have it signed by a notary, and I kept being ding-donged and ding-donged, 'Why you haven't done that yet.'" When plaintiff went to a bank to have the bill of sale "notarized", the notary said, "Now you have signed away your property." Plaintiff testified, "Then I got to realize I had signed away my real estate the same way." And she said she further realized she did not own the property when she went to pay the taxes thereon in 1952. "I nearly lost my mind. I was all upset." (A bill of sale, covering listed furniture and household equipment and appliances, was introduced into evidence. The document was signed by plaintiff as of May —, 1952, and acknowledged June 17th of that year. The bill of sale was to defendant Henry W. Gockel whose name is now shown to have been stricken by pencil from the instrument. A penciled line is also shown to have been drawn through the signature of plaintiff, and across the face of the instrument is the penciled word "Void.")

The witness, Mr. Degnan, prepared plaintiff's will, and it is inferred he also prepared or examined the instrument of agreement between plaintiff and the undertaker Bocklage. The will was not introduced into evidence. The witness could not recall the date of the will. He had searched but could not find a copy; but he said there was nothing in the will concerning the Wise property. When the provisions of the will were being discussed, the Gockels were there "on most of the occasions." They participated as "to dictating the terms, no. But suggestions and so forth, I would say yes, but they did not give any dictatorial comments or orders or commands."

Plaintiff also caused the transfer of valuable shares of corporate stock to herself and defendant Dora, or the survivor. This was for the education of defendants' younger child. About two years later at plaintiff's request the shares were retransferred to plaintiff's "sole registry."

On examination of plaintiff, it was shown that defendants have made some repair and improvement of the property involved herein. They have caused it to be repainted and repapered. They have rebuilt fences; installed a porch railing, replaced screen doors; attempted to beautify the yard and garden by the erection of trellises, arbors and a bird bath; and set out roses. These things were done in 1950 and 1951. The cost of the repairs and improvements was not shown in evidence. Plaintiff testified defendants always said, "everything was done for me." Defendants have not demanded the possession of the property.

An instrument denominated a "Lease" was introduced into evidence. In the instrument defendant Dora was designated as lessor and plaintiff as lessee. The instrument provided that the described property was thereby leased to the lessee for a term commencing on the date of the instrument and ending on the day of the death of lessee with a monthly rental of one cent. The

document was signed by the Gockels, and there was evidence tending to show they had sent the instrument to plaintiff who, it seems, has retained it. The instrument does not bear plaintiff's signature. It is dated February 16, 1953 (a date prior to the institution of this action) and acknowledged on the same day before Mr. Zipf as notary public.

In this case the trial court sustained defendants' motion and rendered judgment for defendants. The motion was made orally at the conclusion of plaintiff's case. Defendants did not introduce any evidence. Consequently, we are without the benefit of evidence other than that introduced by plaintiff. And so it is that much of plaintiff's evidence, including much of her own testimony stands unrefuted, and plaintiff as a witness has not been impeached by any disputation; although there were inconsistencies in her testimony which we have noted, not all of which may be charged to forgetfulness; and, in examining her testimony, we shall weigh and compare her statements of what was her intention with her testimony of what she knew she did. Now, if the evidence introduced by plaintiff establishes fraud or undue influence by proof of the convincing quality prescribed as essential to demonstrating the affirmative of such issues in equitable actions of this nature, we shall reverse the trial court's judgment, otherwise we shall affirm.

It is to be definitely concluded from the evidence that plaintiff intended defendant Dora should have the described property after plaintiff's life and that, in effect, the conveyances of March 29th carried out her intention at the time. This conclusion is compelled by plaintiff's own testimony. According to her own testimony, plaintiff first broached the subject of "leaving" her house to defendant Dora, and there is no substantial basis for an inference that defendants overpersuaded or overreached plaintiff with respect to the execution of the deeds of March 29th. In her brief, although she does not admit, plaintiff does not seriously urge that these conveyances were induced by or were the result of undue influence or fraud. The emphasis in plaintiff's brief is on the questions of undue influence and fraud in the execution of the conveyance of July 21, 1950, and it may be readily seen from the testimony of plaintiff which we have stated supra that her present position is that she was induced to sign the conveyance of July 21st, and did not realize it had the effect of conveying the absolute title to defendant Dora until she, plaintiff, went to pay the taxes on the property in 1952, and that she had never had the intention of giving defendant Dora more than a life estate.

▮ Plaintiff had the burden of proof on the issues of undue influence and fraud. But the affirmative of these issues may be established by circumstantial evidence. In this connection, if the evidence shows a confidential relationship and activity of defendants (who profit by the conveyances as executed), particularly defendant Dora, in causing the preparation and execution of the instrument of July 21st or in persuading plaintiff to make such a disposition of the described property, then an inference of undue influence obtains which inference (and the facts giving rise to it) has a substantial probative factual effect and may be considered together with other evidence on the issue; and the inference, if it obtains in this case and is not balanced or outweighed by the other facts shown in evidence by plaintiff, will be decisive, inasmuch as defendants have not chosen to go forward with evidence tending to show the questioned instrument expressed the wish of the grantor-plaintiff and was the result of her voluntary action. Early v. Koelbel, Mo.Sup., 273 S.W.2d 312; Been v. Jolly, Mo.Sup., 247 S.W.2d 840; Nelson v. Hammett, Mo. Sup., 189 S.W.2d 238; Horn v. Owens, Mo. Sup., 171 S.W.2d 585; Hamilton v. Steininger, 350 Mo. 698, 168 S.W.2d 59; Loehr v. Starke, 332 Mo. 131, 56 S.W.2d 772.

▮ "Undue influence, which is sufficient to warrant a court in holding a will or a deed invalid, must be such overpersuasion, coercion, force, or deception as breaks the will power of the testator or grantor and puts in its stead the will of another." Shaw

v. Butler, Mo.Sup., 78 S.W.2d 420, at page 428; Been v. Jolly, supra; Early v. Koelbel, supra. To invalidate a deed or will, undue influence must be present in active exercise and sufficient to overpower the volition of the grantor or testator at the time the deed or will was made. McCoy v. McCoy, 360 Mo. 199, 227 S.W.2d 698; Snell v. Seek, 363 Mo. 225, 250 S.W.2d 336; Creek v. Union Nat. Bank in Kansas City, Mo.Sup., 266 S.W.2d 737; Aaron v. Degnan, Mo. Sup., 272 S.W.2d 216. It is further observed that the human mind is of the nature that when it has been habituated to the influence of another, it will yield to that influence and suffer it to have its effect, although the person in the habit of its exercise may not be present at the time the act is done, Taylor v. Wilburn, 20 Mo. 306; consequently, in sustaining the issue, it is not always necessary to show overt acts of undue influence at the very time the questioned instrument was executed. State ex rel. Smith v. Hughes, 356 Mo. 1, 200 S.W.2d 360, (but in which case a testator went alone to the office of the scrivener and there was no evidence that the beneficiary ever suggested that testator make a will or had any idea the testator would do so at or near the time when he made the will. In such a case, of course, there are no circumstances of a sufficiently substantial nature to sustain an inference that the beneficiary dominated and controlled the testator's mind in the making of a will so that it stated the beneficiary's wishes and not those of testator.) But it is said the law does not ban as undue the natural influence of affection or attachment or the desire to gratify the wishes of one beloved and trusted. Creek v. Union Nat. Bank in Kansas City, supra, and cases therein cited; Rich v. Baer, 361 Mo. 1048, 238 S.W.2d 408.

We believe plaintiff did not establish that the instrument of July 21st was not the voluntary consummation of plaintiff's intention at the time it was executed and delivered. We have carefully noted that plaintiff apparently went alone to the office of her attorney Mr. Zipf and, although she did not read the conveyance, it was read and explained to her by him. Her statement that she was confused by the attorney's extended explanation of the effect of the instrument is not to be taken as meaning that she did not understand its legal effect as being a conveyance of the "property fully to Mrs. Gockel." It must be conceded plaintiff's own testimony tends to show the full effect of the deed of July 21st was made known to her in connection with the attorney's conversation relating to his doubt as to whether a gift tax was involved. We have also mentioned plaintiff's statement that she received the unearned portion of an insurance premium. Plaintiff did not testify or introduce evidence tending to show that Mr. Zipf misrepresented the effect of the deed or that Mr. Zipf had in any way conspired with defendants in the exercise of any artifice or deception.

There is one incident we wish to again mention. This occurred during the summer of 1950 when the witness, Mr. Degnan, was examining the two conveyances of March 29th. Apparently Mr. Degnan did not see the deed of July 21st. This, because Mr. Degnan advised plaintiff she retained a life interest in the property. Now, had it been the fact that plaintiff had executed and delivered the deed of July 21st before this conference, then defendant Dora's assurance that plaintiff was secure in the possession of her home and that they, defendants, would not dispossess her, "in fact, could not", would have been a deception and might have been decisive of this case. But we are mindful of plaintiff's burden of proof in this connection, and we emphasize there was no evidence introduced tending to show that the instrument of July 21st was in existence at the time of Mr. Degnan's visit. No other conduct on the part of defendants is shown which savors of fraud or deception.

In this case, we do not have a grantor in an enfeebled mental and physical condition, or in inebriacy, as in Cook v. Branine, 341 Mo. 273, 107 S.W.2d 28; Colquitt v. Lowe, Mo.Sup., 184 S.W.2d 420; Holland v. Anderson, Mo.Sup., 196 S.W.2d 175; Bohnsack v. Hanebrink, Mo.Sup., 240 S.W.2d 903, and Meyer v. Schaub, Mo.Sup., 266

S.W.2d 620; nor do we have a sick and weakened grantor induced by a fraudulent promise to execute a "clear deed", as in Mentzer v. Mentzer, 325 Mo. 941, 30 S.W. 2d 146. Her own testimony, and our own examination of her manner of expression demonstrates that plaintiff is an educated and intelligent woman of strong will, and in reasonably good health of body and mind for one of her age. There was no showing that her illness had a disabling or impairing effect on her physical and mental health and faculties.

Grantor-plaintiff and grantee-defendant Dora bore a relationship of close friendship. Plaintiff had no relatives of close degree and her benefaction to her best and most intimate friend was not an unnatural one. In a way the conveyance of the absolute title was improvident in that it carried with it the right of possession. Plaintiff apparently thought she could rely on some express or tacit understanding and confidence that defendant Dora would not dispossess her. If so, defendant has not violated the confidence. It is inferred plaintiff had other property, but its extent and value were not shown. Plaintiff has reposed confidence in defendant Dora, and even prior to the date of the execution of the instrument of July 21st, plaintiff had delegated to her friend the handling of plaintiff's personal business transactions. We shall assume their relationship had become a confidential and fiduciary one, such as a chancellor may recognize as a factor in determining an issue of undue influence. Nevertheless, plaintiff had the purpose initially to make disposition of the described property to defendant Dora in remainder, and it seems clear plaintiff was desirous of further vesting the title in compliance with defendant Dora's wishes. Plaintiff testified of the request which was made by defendant Dora at the time plaintiff was making her will. Plaintiff testified defendant Dora said, "Don't put that in any will. * * * Give it to me outright." While plaintiff was no doubt influenced by this request and by her close friendship with defendant Dora, yet defendant Dora had the right to exercise her influence so long as the exercise was not so coercive or importune as to destroy or deprive plaintiff of her free agency. Been v. Jolly, supra; Horn v. Owens, supra. With the knowledge of the effect of the deed of July 21st, plaintiff seems to have been content with the grant of the absolute title until more than two years after the instrument was executed. Considering these facts disclosed by plaintiff's evidence, we cannot believe we should give effect to an inference of undue influence or fraud. Now, the record does not disclose any violation of the confidence plaintiff had in defendant Dora, and we do not know why it was plaintiff changed her attitude toward her. But we do say we believe plaintiff has not sustained her burden of proving the questioned conveyances were the result of undue influence or fraud.

The judgment should be affirmed.

It is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.