**David M. BEVINS, Appellant,**

v.

**Jasper C. HARRIS and Marian Jean Harris, Respondents.**

**No. 50180.**

Supreme Court of Missouri,

Division No. 1.

June 8, 1964.

Motion for Rehearing or to Transfer
to Court En Banc Denied
July 13, 1964.

As Modified on Court's Own Motion
Aug. 18, 1964.

Robert F. Sevier, Wiliam E. Turnage, Sevier & Turnage, Liberty, for appellant.

John W. Newhart, L. Glen Zahnd, Savannah, William B. Waters, Liberty, for respondents, Hale, Coleberd, Kincaid & Waters, Liberty, of counsel.

HOUSER, Commissioner.

Suit in equity by David M. Bevins to set aside a warranty deed to a farm, to void a written contract and to require defendants to reconvey the farm to plaintiff. The defendants, Jasper C. and Marian Jean Harris, husband and wife, are the named grantees in the deed and parties of the second part in the contract. The real estate conveyed is an unencumbered 346-acre farm in Clay County. Estimates of its value ranged from $95,000 to $120,000. The trial chancellor upheld the validity and enforceability of the warranty deed and contract; found that the defendants had performed the contract to the extent that they were permitted to do so by plaintiff but that plaintiff had rendered it impossible for defendants to perform certain obligations under the contract; ruled that nevertheless plaintiff was entitled to recover a sum of money monthly for the remainder of his life equal to the reasonable value of the services defendants agreed to render plaintiff under one paragraph of the contract, and ordered that after this judgment be-

came final a further trial be granted to determine the reasonable monthly value of these services. Plaintiff has appealed from the judgment.

The petition alleged that defendants set upon a deliberate plan and scheme to obtain plaintiff's real and personal property by fraud, deceit and undue influence, without any adequate consideration therefor, and that, imposing on defendant's physical and mental weakness and infirmities of old age, and by fawning over him and using endearing terms defendants induced him to sign a deed to his farm at a time when he did not have his eyeglasses, representing that the instruments expressed an agreement with reference to a partnership operation of the farm and livestock; that the contract was the purported consideration for the deed but that the contract is void for lack of mutuality, and void for the further reason that it makes a testamentary disposition of property without complying with the statutes of wills; and further, that defendants breached the contract by failing to perform.

Defendants' original answer was a general denial, except that the execution of the deed and contract was admitted, and except for an allegation that defendants' failure to live in the house with plaintiff and comply with their obligations under the contract was not their fault but his, in that plaintiff physically choked, assaulted defendant Marian Jean Harris and threatened to kill her, thereby causing her harm and fear for her life. At the close of the evidence defendants amended their answer to allege estoppel and that the conveyance was a gift.

Appellant makes three points.

Appellant's first point is that the court erred in not setting aside the deed because the evidence showed that he executed the deed without consideration and without intent to convey any interest in his farm to respondents, and that respondents have refused to deed the farm back to appellant on his request. On our independent review we find the evidence overwhelming that appellant intended to convey the title to his farm to respondents, reserving a life estate in himself.

■ Appellant, who had owned and farmed the land for 52 years, was 74 years old when his wife died on September 15, 1961. Although he was undergoing treatment for hardening of the arteries and heart trouble, appellant was active enough to take care of the livestock and operate his farm from the date of his wife's death until November, 1961, except for some help with the tobacco crop. Appellant had no children. His closest relatives were first cousins. Respondent Jean Harris, age 27, was a grandniece of his deceased wife. She and her parents had stayed at the home of the Bevins one winter during Jean's infancy. While the relationship between appellant and Jean had not been close, he had known her since childhood and he had known her husband, Jasper, since her marriage in 1953. Appellant often conferred with Jean's mother, Floy Holman. He named Mrs. Holman executrix of his will. Jasper was 27 years of age at the time in question. In a conversation with Jasper in 1958 or 1959 appellant learned that Jasper had been raised on a farm and that he would like to get back on a farm. At that time appellant suggested to Jasper that he "come on out and farm" with appellant on a partnership basis, but nothing came of this suggestion. In mid-October, 1961, following the death of appellant's wife, appellant invited respondents to his farm and told them that he had been thinking of deeding the farm to them; that he wanted to give it to someone who would appreciate it; that he did not want to sell it because of fear that taxes would "get the biggest part of it" and did not want the heirs to be fighting over it. He suggested a partnership operation of the farm, he furnishing the livestock, machinery and feed on hand, and that the cost of all feed purchased be equally divided. Appellant had talked to Robert Frost, a lawyer, about the matter and indicated that a contract

would be drawn. Jasper, then employed as a mechanic at TWA, was making $400 a month. Respondents wanted to think it over. About the same time, in mid-October, appellant had a conversation with Jean's mother in which he asked "whether the kids would be interested or not"; stated that he would "deed the farm over to Jean and Jasper for his lifetime and they were to stay there and take care of the farm and keep house for him," and indicated willingness to help respondents with respect to their financial needs. On October 27, 1961 Jasper was furloughed at TWA and it was not then known when or if he would be recalled to work. A furlough is a termination of employment without loss of seniority rights. Previously, in August, 1961, appellant had told Jean's mother that he wanted Jean and Jasper to come down on the farm and live with him; that he wanted to have a contract, and would deed the land reserving a life estate. Appellant told Jean's mother that he had been thinking about it for three or four years. She expressed doubt that appellant, an older man, could get along with the three young children of the respondents, to which appellant retorted that she did not know what she was talking about. Jasper wanted the advice of his parents and at appellant's invitation they looked at the farm and talked to appellant, who told them that he did not want "to talk the kids into something that they would be sorry of"; that for him to give them the farm "the kids" would have to come there and take care of him and make a home for him the rest of his life.

■ On the evening of October 31, 1961 Jasper, Jean, Jean's father, appellant and the lawyer, Robert Frost, met at the latter's office, to discuss the matter. The arrangements for this meeting were made by Mr. Frost, at the instance of appellant. Mr. Frost was employed and paid by appellant. The latter two did most of the talking. Appellant outlined the terms of the agreement, by which he was to deed the farm to Jasper and Jean, reserving a life estate to himself, and there would be a partnership under which appellant was to furnish the cattle and machinery and Jasper was to furnish the labor, the increase of the cattle to be split 50–50, with the parties sharing 50–50 the cost of any feed purchased. The young people were to move into the house as soon as possible, assist with the chores and work to be done, and care for appellant the rest of his life. Mr. Frost made written notes. Jasper said little and stated none of the terms of the agreement. Later, after Mr. Frost had the agreement typed, copies were given to the parties, and Jasper, Jean and appellant sat down together and read the contract in detail. Jasper pointed out to appellant that the paragraph which gave respondents, but not appellant, the right to terminate the contract was unfair (to appellant). Appellant was satisfied. This provision was his idea and he said he could see no reason why he would "want out"; that he had every reason for living up to the contract.

The next meeting was held at Mr. Frost's office on November 6, 1961. Jasper drove appellant to the meeting, going by way of the bank at appellant's request to get a description of the farm, which was given to the lawyer for insertion in the deed. The deed and contract were presented to appellant who signed both of them without objection or question and with full knowledge of their contents. They were executed by the parties as one transaction. No money was paid to appellant upon execution of the documents.

The warranty deed was a regular printed form, except for the provision reserving to grantor a life estate in the lands conveyed. It did not contain any reference to the written contract or to the obligation of the grantees to provide a home for appellant for the rest of his life. It recited a consideration of "One Dollar and other valuable considerations." The notary taking the acknowledgment was Robert Frost, the lawyer. Jasper filed the deed for record the day after it was executed.

The contract recited that appellant had that day deeded his farm to the respondents, reserving to himself a life estate, and that the parties had agreed on a joint operation of the farm lands. By the terms of the contract appellant agreed to furnish 71 cows and 3 bulls, all hay and other feed then on hand, and farm machinery and to pay for all oil, grease, repairs and upkeep of the machinery, make all repairs on the home and buildings, pay all taxes and insurance, and to make necessary financial arrangements to provide respondents with funds sufficient to maintain the home and farm until such time as there would be income from the farm. Respondents agreed to move into the house, make it their permanent home, operate the farm and furnish all labor necessary for the farm operation, maintain fences, mow all pastures and fence rows in proper season, make minor repairs on farm buildings. The parties agreed to split the increase from the cows, and sows and hogs, and to split the feed bills evenly. They agreed on the title to the livestock which, unencumbered, was worth $18,000. In case of the death of appellant the machinery and livestock were to become the property of respondents and not become a part of appellant's estate.

Paragraph 16 provided that the parties of the second part "shall make a home for party of the first part so long as he lives and shall furnish meals for first party, do his laundry and keep his home clean and neat."

Paragraph 17 read as follows: "It is further agreed that if, for any reason, said parties of the second part should decide to terminate this working agreement, then and in that case, each party hereto would take one half of the increase and first party should retain his original livestock and machinery."

Within a few days after the documents were executed respondents moved out of their own house and moved to the farm, placed their children in the new school, and commenced to operate under the contract.

The only evidence in support of appellant's contention that he did not intend to convey an interest in the land was his own uncorroborated testimony that he did not know for several months that he had signed a deed to the farm; that there had been no discussion of deeding his property to respondents; that the discussion related to a 50–50 partnership agreement, but there was no agreement on his part that upon his death all of the machinery, livestock, hogs and feed on hand would belong to the defendants; that he would not have signed the contract if he had known that he had deeded the farm to respondents; that he did not have his glasses with him on the day the papers were signed; that before signing he asked respondents if what was presented to him for signature was the 50–50 partnership contract they had discussed and they said "yes"; that he signed the papers on this assurance and in the belief that he was entering into a partnership for the operation of the farm and nothing else. This version of the facts was diametrically opposed to the testimony of Jasper, Jean, Mr. and Mrs. Holman, the senior Harrises, and, significantly, of appellant's own lawyer, a highly respected attorney. Mr. Frost testified positively that the whole situation, deed, contract and all, was discussed with appellant. The substance of the attorney's testimony was that appellant knew that he was deeding his farm to respondents; that the contract and deed were the thinking of appellant; that not a word was contributed to the contract by respondents; that the only contents of the agreement suggested by the lawyer was the inclusion of paragraph 16 as a matter of fairness; that it was suggested to appellant that under paragraph 17 respondents could "walk off" and still have a deed to the place; that he had advised appellant that he was being very generous with these young people, and that appellant answered that that was what he wanted to do—to give them the farm. On this sharply contradictory testimony we adopt the following finding of fact made by the

trial chancellor, who had a superior vantage point from which to judge the credibility of the witnesses and to evaluate their testimony: "8. Plaintiff was fully aware of the nature and contents of said contract and deed, and that he executed the same freely and without fraud, deceit, duress or undue influence on the part of defendants or any other person or persons and that it was the intent and desire of plaintiff to deed the above described real estate to defendants, reserving a life estate to himself."

Since the evidence overwhelmingly demonstrates that plaintiff intended to convey the farm to defendants, reserving to himself only a life estate, the principles announced in the cases of Cook v. Branine, 341 Mo. 273, 107 S.W.2d 28, Mentzer v. Mentzer et ux., 325 Mo. 941, 30 S.W.2d 146, and Colquitt v. Lowe, Mo.Sup., 184 S.W.2d 420, that where a deed is made without consideration and without intention of transferring the property or of conveying title to the grantee title does not pass and equity will intervene and cancel the deed on refusal of the grantee to return the property to the grantor upon his demand, are inapplicable. In Mentzer and Colquitt the deeds were induced by misrepresentation and undue influence, respectively, elements wholly absent in this case. There is no credible evidence to substantiate appellant's allegations that respondents planned and schemed to obtain his property by fraud, deceit, undue influence, or by imposition on his alleged physical or mental weakness. The moving party in this entire transaction was appellant. He had thought about it for years. He had proposed a joint farming partnership in 1958 or 1959, without succeeding in interesting Jasper. Again in 1961, after his wife's death, appellant took the initiative, this time combining the suggestion of deeding the property with the previous proposal of a farming partnership. Again appellant experienced difficulty in persuading respondents to accept his proposal. He sought to "sell" their parents on the idea. It was not respondents' idea. This is not the case of a covetous young couple fawning over, persuading and influencing a reluctant, elderly man and by their blandishments inducing him to convey to them an interest in his property. The shoe is on the other foot. Any reluctance in this case was that of the respondents. They wanted time to think it over. Jasper wanted to be sure it was a permanent arrangement before he gave up his seniority rights and employment at TWA. Nor did appellant have any misapprehension as to the terms of the contract placed before him for his signature. Not only his attorney but also Jasper himself advised appellant with reference to the generosity and unfairness of certain provisions appellant had suggested. Appellant rejected their advice, apparently determined to include in the document the terms and conditions he had dictated. Appellant got the kind of an agreement he wanted. We conclude that with full knowledge of what he was doing and in full possession of his faculties appellant intended to convey a remainder interest in the farm; that he was thoroughly familiar with the fact that he was so doing; that he fully understood the provisions of the written agreement and was anxious to have the deed and the agreement executed as prepared.

Appellant's second point is that the court erred in not setting aside the deed because the evidence showed that respondents failed to perform their agreement to make repairs and to keep the home neat and clean for appellant. Citing Hood v. Throop, Mo.Sup., 280 S.W.2d 106, Wagner v. Hicken, Mo.Sup., 232 S.W.2d 531 and Finley v. Williams, 325 Mo. 688, 29 S.W.2d 103, appellant takes the position that respondents failed to perform their contractual obligations with respect to the operation of the farm and the care of appellant and of the house, and that such failure of performance entitles him to a cancellation of the deed. The evidence pro and con on this issue occupies many pages of this 682-page transcript, but we need not state the evidence or weigh it on this point, because

of a misapprehension under which appellant is laboring. Under the facts of this case the failure of respondents to perform their contract obligations, even if established by sufficient competent evidence, would not entitle appellant to a cancellation of the deed. Where a deed is executed in consideration of the promise of the grantee to support the grantor, etc., without any clause looking to a forfeiture, or re-entry or reverter for nonperformance, and there is no showing that the grantees practiced a fraud upon the grantor or took unfair advantage of him, there is no basis for a decree of cancellation. The estate conveyed vests in the grantee, does not await performance of the promise and may not be divested by nonperformance. Where the parties make the promise itself the consideration for the conveyance, the grantor's remedy is a suit for breach of the agreement. A leading case is Anderson v. Gaines, 156 Mo. 664, 57 S.W. 726, where the court said, bottom of page 727, et seq.: "The promise of even an insolvent man to render a valuable service is a sufficient consideration to support a deed, and, if the deed is given in consideration of the promise, the estate conveyed vests in the grantee. The title is not held in abeyance until the performance of the promise, nor devested for a nonperformance. It was competent for the parties, if they had seen fit to so agree, to make the performance of the promise a condition precedent to the vesting of the estate, or its nonperformance a condition subsequent for which the estate might be devested; but, when they choose to make the promise itself the consideration, the grantor's only remedy is a suit for a breach of the covenant. Whether, in case the grantee break his covenant, and is insolvent, yet still holds the property conveyed in the deed, a court of equity could subject it to payment of the damages awarded, need not be answered here. It is sufficient now to say that for that reason the court cannot rescind the contract or cancel the deed. Studdard v. Wells, 120 Mo. 25, 25 S.W. 201; Taylor v. Crockett, 123 Mo. 300, 27 S.W. 620; Brown v. Fickle, 135 Mo. 405, 37 S.W. 107. There is no charge in this petition of fraud or unfair advantage taken by defendant, and there is no clause in the deed looking to a forfeiture, a re-entry, or reverter. There is nothing in the petition upon which a decree for the cancellation of the deed can be founded." In Alward v. Boatwright, Mo. Sup., 193 S.W. 568, 1. c. 570, this Court said: "The petition, and plaintiff's cause of action, are bottomed solely upon the erroneous idea that if defendant failed to comply with the requirements of said deed, in respect to the things which he was obligated to do for the benefit of plaintiff, the latter would be entitled in a court of equity to a decree setting aside and canceling the deed, although it contains no provision declaring a forfeiture, or reverter in case appellant failed to comply with his contract. There is no provision therein declaring the deed void, or providing for a re-entry in case defendant should fail to perform his part of the agreement. The deed contains no condition subsequent, and hence the petition based thereon does not allege any facts which would warrant a court of equity in setting aside and canceling the same, even if defendant failed to comply with the agreement specified in the deed. The conclusion is irresistible that on the facts presented in the record the petition fails to state a good cause of action. * * * [citing eleven cases]. Tested by the rules of jurisprudence laid down and followed in the above and many other cases in this state, we are compelled to hold that plaintiff's petition fails to state any facts which would warrant us in setting aside or canceling said deed." See also Key v. Kilburn, Mo. Sup., 228 S.W.2d 731, 737, 738 [12]; Kohnke v. Kohnke, (en banc) Mo.Sup., 250 S.W. 53, 56 [1]; Allison v. Cemetery Caretaking Co., 283 Mo. 424, 223 S.W. 41. The Hood, Wagner and Finley cases, supra, are distinguishable on the facts. In them the evidence supported a finding that the grantees never intended to perform and justified a holding that a fraud had been perpetrated on the grantors. See Allan v. Al-

lan, Mo.Sup., 364 S.W.2d 578, 582. While the performance of respondents in the case on review did not satisfy appellant, respondents in good faith made a sincere effort to comply with their contractual obligations, and substantially performed, except insofar as their performance was interfered with by appellant as we have seen, there was no evidence of fraud on the part of the respondents, and for this Court to draw such an inference would be contrary to the evidence and wholly unjust.

Appellant's third point is that the court erred in not setting aside the deed because the evidence showed that the contract was given as the sole consideration for the deed, and that the contract was void for lack of mutuality. The basis of this contention is the provision of paragraph 17 of the contract for the division of the increase of the livestock and the retention by appellant of the original livestock and machinery "if, for any reason, said parties of the second part should decide to terminate this working agreement." Appellant contends that paragraph 17 gave Jasper and Jean an unconditional right to terminate the entire contract at any time—an option to terminate not only the agreement with reference to the partnership operation but also the obligation to provide a home, meals, laundry, etc.; that an absolute and unconditional option on the part of one party to a contract to cancel, with no independent consideration therefor other than the promise of the party holding the option, invalidates the entire contract because of lack of mutuality of obligation. Appellant cites Hudson v. Browning, 264 Mo. 58, 174 S.W. 393; Middleton v. Holecroft, Mo.App., 270 S.W.2d 90; Naify v. Pacific Indemnity Co., 11 Cal.2d 5, 76 P.2d 663, 115 A.L.R. 476; Anno.—Reserved Right to Cancel Contract, 137 A.L.R. 919; 17 C.J.S. Contracts § 100(1), p. 790, § 100 (6). Respondents propose three answers to this contention: (1) that the termination referred to in paragraph 17 relates only to the partnership operation of the farm, and not to paragraph 16; (2) that there was partial performance, which furnishes a consideration independent of the promise; (3) that respondents, having changed their position, may rely upon the doctrine of promissory estoppel. In our judgment appellant's third point is answered by the proper construction of paragraph 17.

■ Paragraph 17 did not give Jasper and Jean an unconditional right or option to terminate the arrangement provided for in paragraph 16. Paragraph 17 referred only to the provisions of the "working agreement," which we construe to mean the partnership operation. No fixed term was agreed upon for the duration of the partnership and under the law the respondents could dissolve it at any time upon notice, without the consent of appellant. Schneider v. Newmark, 359 Mo. 955, 224 S.W.2d 968; 68 C.J.S. Partnership § 332 a., p. 843. Paragraph 17 provides an agreement for two consequences of a dissolution of the partnership, but is silent as to the consequences of a cessation of performance by respondents of their duties under paragraph 16. Paragraph 16 imposed upon respondents a continuing obligation for the life of appellant, an obligation not susceptible of termination at will by them. The promises made by respondents in paragraph 16 make the obligations of the parties mutual and binding and provide an adequate consideration for the deed.

At this point we need to briefly state further facts. Except for his opinion that Jasper should have given more attention to the calving of the cows appellant had no complaint as to the manner in which Jasper and Jean performed their duties under the contract from November 16, 1961 to March, 1962, when appellant went to Phoenix, Arizona for a 3-weeks visit. TWA sent Jasper several recall notices in December, 1961 and January, 1962, to which he did not respond. Appellant did not want Jasper to return to work for TWA. In February, 1962 Jasper received a final termination notice that his name was being removed from the seniority list, as a result of which he lost seniority rights accumulated since his first employ-

ment with TWA in 1953. When appellant returned from Arizona he indicated that he had been greatly attracted to that country, had bought a house there, and intended to shortly return to Arizona to live. Not long after his return from Arizona appellant's attitude changed. He began to find fault with Jasper. At his own expense Jasper, in appellant's absence, had installed a cattle guard in place of a gate. Appellant was critical, observing that he could never afford a cattle guard; that for fifty years his wife had opened that gate for him and he did not see why Jasper could not open the gate. The relationship changed from that of partners to that of employer and employee, and he began to issue orders to Jasper with reference to things that should be done. On a Saturday in June, at a time when Jasper was busy putting up hay, appellant decided that it was time to plow a ten acre field of corn. Jasper told appellant that he was putting up hay and if he would wait until Monday he would plow the field. Without further discussion appellant hired a farmer in the vicinity to plow the 10 acres and later hired him to do a second plowing, without consulting Jasper. Relations became more strained. Appellant constantly suggested things for Jasper to do, notwithstanding Jasper kept himself busy, trying to keep the farm up, taking care of the livestock, baling 6,000 bales of hay during the summer, and making reasonable efforts to comply with his contract. Appellant had signed Jasper's note for $9,000 to give him operating capital. In June, 1961 Jasper, needing more financing, approached appellant, who refused to go on any more notes unless Jasper "released" the deed to him. Jasper refused this request, stating that he "wouldn't have any security at the farm." In July, 1962 appellant filed this suit. The parties continued to stay on the farm and respondents continued to make a home for appellant and provide plaintiff with meals, until September 8, 1962. On that day Jasper was gone from the farm, attending a religious retreat. Respondents, religious people, occasionally would be gone from the farm for hours at a time attending various religious affairs. This displeased appellant, who was not a religionist, and on September 8 he was angered by Jasper's absence from the farm. He grabbed Jean by the arm, pushed her into the door, stated that he knew what the Harrises were trying to do to him, and complained about Jasper's not staying home. She told him to let go, that she was not afraid of him, and had started to prepare supper when he got hold of her neck, turned her around, got right up next to her face and said, "I could kill you right now, you know that, don't you?" After he let go he told her not to leave and not to tell anyone what he had done, threatening several times to kill her—shoot her—if she told anyone. She knew he had a shotgun, a rifle and a pistol at the house which he kept loaded at his bedside. She agreed with him, tried not to "row him anymore than he already was," and prevailed upon him to sit down and eat. Then Jean collected her children and left the farm, going to her parents' home. As a result of this experience she had a nervous breakdown, hysteria, weeping spells, lost weight and for several weeks, unable to work, she was under the care of a physician. Because of this occurrence Jean did not return to the farm because of fear of bodily harm. Jasper nevertheless continued to work on the farm, feed the livestock, care for the animals and perform his other contractual duties until the partnership was terminated by agreement of the parties early in 1963.

 Recapitulating, respondents, one of whom performed for 10 months and the other of whom performed for 14 months under the contract, now find themselves the owners of a remainder interest in a valuable farm, and appellant, whose lifework was the building up of this farm and clearing it of debt, finds himself old, physically incapable of operating the farm, a widower, and in need of a home and a housekeeper. Respondents are obligated by contract to provide him with a home, meals, laundry services and to keep the place neat and clean,

but because of appellant's misconduct, appellant's dissatisfaction with respondents, and the deep-seated friction engendered between them a reconciliation and resumption of the relationship established by the contract seems out of the question. A denial of relief would result in a substantial loss to appellant, and an unconscionable enrichment of respondents by which, without the necessity of rendering any further service under their contract, they would retain a remainder interest in a farm worth approximately $100,000. Appellant's assault and threats constituted an unfortunate mistake and a wrong doing on his part, but that isolated incident is not enough to deny appellant all relief. Notwithstanding the parties can no longer live together in the "home" relationship contemplated in the contract and the impossibility as a practical matter of executing the contract in the manner originally intended, we are of the opinion that in view of his age and the circumstances, appellant is entitled to "such relief as in equity and good conscience will secure compensation to the plaintiff for such loss as will result to him." Priebe v. Sette, 197 Minn. 453, 267 N.W. 376, 378, and cases cited. Relief similar to that afforded in Priebe v. Sette, supra, seems appropriate. We are unable to devise any more suitable substitute for the personal services of respondents than that prescribed by the trial chancellor, namely, the requirement that respondents pay appellant the reasonable monthly value of the services reserved in paragraph 16 of the contract for the benefit of appellant for life, beginning September 8, 1962, as modified by the further requirement that as security for the payment of the amount to be fixed the same shall be adjudged a first and superior lien upon the remainder interests of respondents in the land; or any other modification of the original judgment which may be required in equity and good conscience in the light of subsequent developments. In fixing the amount to be paid by respondents to appellant each month due consideration shall be given to whatever losses the evidence may show respondents have suffered, such as the obvious loss of the cost of housing respondents and their children, and credits and offsets shall be allowed respondents therefor.

Accordingly, the judgment of April 25, 1963 is affirmed as modified by the preceding paragraph of this opinion, and the cause is remanded for a further trial to determine the reasonable monthly value of the services, less any credits and offsets deemed proper, in accordance with this opinion and the order of the trial court, and for the entry of final judgment.

COIL and WELBORN, CC., concur.

PER CURIAM.

· The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur except HENLEY, J., not sitting.