JAMES E. BOVARD v. SPENCER D. BOVARD, Appellant.—No. 38780.—180 S. W. (2d) 592.

Division Two, May 2, 1944.

Rehearing and Motion to Transfer to Banc Denied, June 5, 1944.

954

*White & Hall* for appellant.

*Franklin D. Glore* and *Walter R. Barnes* for respondent.

WESTHUES, C.—Respondent filed this suit in the Jackson County Circuit Court to set aside a deed and an assignment purporting to convey respondent's interest in the estate of John H. Bovard, deceased, to the appellant. The grounds relied upon were failure of consideration and fraud. The trial court granted plaintiff the relief prayed for and entered a decree canceling the deed and assignment. An appeal from the jugment was duly taken.

Appellant is a nephew of respondent. John H. Bovard, deceased, from whom respondent inherited the property in controversy, was an uncle of respondent and a great-uncle of the appellant. Respondent, as an heir of John H. Bovard, deceased, was entitled to a one-sixth interest in the estate. The value thereof was conceded to be in excess of $10,000.00.

This is a suit in equity and therefore this court reviews the evidence and tries the case de novo. If our finding ▮ be at variance with that of the trial court the decree nisi will be set aside. Lynn v. Coates (Mo.), 142 S. W. (2d) 1014, l. c. 1019 (1); Houts, Missouri Pleading and Practice, vol. 2, p. 525, sec. 538. The reason we mention this is because respondent contended in his brief that appellant had not preserved this question for our review. In the motion for new trial appellant assigned error and asked for a new trial "because the decree of the court should be in favor of the defendant." In the brief an assignment of error reads as follows: "Under the evidence, the trial court was not justified in setting aside the deed and the assignment." The question of the sufficiency of the evidence to support the decree was briefed with citations of authorities. We rule the question was preserved for review.

It will be necessary for an understanding of the case and to properly weigh the evidence to get a background of the parties and their relation to each other. The respondent was over seventy years of age at the time of the trial. He was practically deaf, and we learn from the record that the questions asked him at the trial were reduced to writing. He had had difficulty with his sense of hearing for many years, and for the last five or six years could not carry on a conversation unless, as a number of witnesses testified, the party talking with him shouted. There was a conflict in the evidence on this point, but the overwhelming weight thereof was that for a number of years

it had been difficult for him to hear an ordinary conversation. Respondent had never held any position which brought him a substantial remuneration. He was employed in the office of the circuit clerk for four years (1906-1910) as a file clerk at a salary of $100.00 per month. That was more money than he made at any period in his life. Respondent performed odd jobs such as painting and repairing for an owner of a number of buildings for which he received small sums and a room. After 1931 he was frequently on what is commonly termed WPA. He also received a small sum monthly as an old age pension. His bank accounts and postal savings were examined and it was disclosed that at no time did he ever have in excess of a few hundred dollars. He had always lived in very poor circumstances. Respondent asserted in his petition that the deed and assignment whereby he transferred to appellant his one-sixth interest in the estate were without consideration. Appellant denied this and offered evidence of consideration. Appellant was in the printing business making a specialty of printing law briefs. He testified that he advanced $4,000.00 in cash to respondent to enable him to make a down payment on a hotel respondent was purchasing; that he, appellant, mortgaged his printing plant to obtain the cash. He testified that respondent executed notes and a deed of trust dated October 20, 1936, on the one-sixth interest and delivered them to appellant. These were introduced in evidence. Appellant stated these were canceled in consideration of respondent assigning to him his interest in the estate. Respondent admitted that the signatures on these papers appeared to be in his handwriting as well as the signature appearing on a receipt for $4,000.00. His explanation of how his signature was obtained was as follows:

"Q. I don't know whether I have asked this before or not. I will ask it again. Did you received any money whatever for those two $2,000 notes? A. No, sir.

"Q. Why did you sign those notes and that deed of trust securing them? A. Because Spencer asked me to.

"The Court: Ask him if he has any explanation for the receipt?

"Q. (Mr. Glore) What is your explanation for signing this receipt? A. I didn't sign it. That is my signature but I didn't sign it. I don't know anything about that contract.

"Q. Did Spencer ask you to sign your name on some new paper he had to try it out? A. Yes, sir.

"Q. Explain. A. Well, he wanted me to sign my name on some paper, he had several sheets there and he says, 'I want to test the quality of the paper.' I didn't think any—I think I signed, 'J. E. Bovard' and he said, 'Don't sign it like that. Sign it James E. Bovard, like you do down there.'

"Q. Did you do it? A. Yes, sir. I didn't think anything about it. It was just paper."

Respondent emphatically denied that appellant ever advanced him any such sum as claimed and that he never considered the purchase of a hotel. The claim of appellant that he mortgaged his printing plant to advance $4,000.00 to respondent to purchase a hotel sounds preposterous. Appellant, when asked what hotel respondent desired to purchase, said he did not know, and that he took his word for it. If the notes and deed of trust were canceled because of the transfer of the one-sixth interest to appellant, why did appellant retain them in his possession as well as the receipt, and why should a receipt have been given if respondent signed notes and a deed of trust for the money? Aside from all this, the story of appellant mortgaging his property to obtain $4,000.00 to advance to respondent for the purchase of a hotel, when the financial situation was indeed uncertain, and while respondent, who had never met with success in the financial world, was on WPA, is simply unbelievable. The trial court did not believe it, and in its finding of facts stated that appellant did not advance respondent any money as claimed. The finding was fully justified and we assent thereto.

On the question of fraud we must also give a short history of facts leading up to the execution of the assignment and deed sought to be set aside. About the year 1924, respondent took title to a house and lot as a straw man for his brother. Respondent signed a note for $7,500.00, secured by a deed of trust on this property. Respondent did not take possession of the property nor did he make any payments on the note. The brother and his family occupied the house and made payments amounting to $3,500.00 on the note. The brother died and thereafter respondent deeded the property to his sister-in-law, the brother's wife. Later, on June 11, 1937, a foreclosure was had and the property was purchased by the owner of the note for $4,500.00, leaving a deficiency on the debt of $587.49 and some taxes. No effort was made by the holder of the note to collect the deficiency from respondent. The agent of the holder of the note so testified. The deed and assignment sought to be set aside were dated July 9, 1937. Spencer D. Bovard, the appellant, was co-administrator of the estate of John H. Bovard, deceased, which was then pending in the probate court. Respondent had at times performed odd jobs in appellant's printing plant and was on good terms with him. Respondent testified that in July, 1937, appellant informed him that someone had been at the printing plant inquiring about respondent with regard to collecting a deficiency on the note he had signed for his brother, and that respondent's interest in the John H. Bovard estate was in danger. Respondent testified he did not know there was a deficiency, and that he did not consider he owed any part of the note; that the place foreclosed was sufficient to pay the balance due on the note. We quote the following from the cross-examination of respondent concerning what transpired between appellant and himself:

"Q. You wanted to transfer your property so the insurance company couldn't get it for any deficiency? A. I just left it to Spencer to fix it.

"Q. But that was your purpose? A. When Spencer said this man was looking for me to collect this deficiency judgment I said, 'What shall I do?' I didn't owe it. He said, 'You leave it to me. I'll fix it.' I don't know whether I had a purpose in my mind or not. I just left it to him. He was in the law printing business and had a lawyer and I didn't know.

"Q. You wanted to transfer your property so that the insurance company couldn't get it for any deficiency? A. I left it to him. He saw that as I thought was the right way to protect me and he made the papers and I signed them. I didn't know there was any deficiency until that date when he told me about it, or supposed to be a deficiency.

"Q. Was that the reason you signed the papers? You wanted to transfer your property so the insurance company couldn't get it for any deficiency. Was that the reason you signed the papers? A. I didn't have any property only supposed to be one-sixth interest to be paid out to the heirs.

"Q. That is the property I mean. A. All right. I didn't know there was any deficiency. I just took Spencer's word for it and he promised to protect me and I left it to him.

"Q. You wanted to transfer your property so the insurance company couldn't get it for any deficiency? A. I didn't have any wants about it. I guess Spencer done all the wanting and figuring and all that sort of thing. I simply signed the papers that he gave me. I left it to him.

"Q. Why did you sign the papers? A. Because he asked me to.

"Q. Had you talked with him about a deficiency at the foreclosure sale? A. I didn't know there was a deficiency. I couldn't talk about it. I believe he was the first one that told me about the foreclosure at that time. Then he said this man was looking for me."

Appellant denied that he ever discussed any deficiency on the $7,500.00 note with respondent. His contention was that he took the assignment of the one-sixth interest in payment of the $4,000.00 advanced to respondent. The trial court found against appellant on that issue and, as above noted, the finding was fully justified. Respondent was supported in his contention that appellant took the assignment for the purpose of holding it for his benefit. Appellant's former wife testified that appellant told her he wanted the assignment and wanted to hold the property for respondent. Note her testimony:

"Q. Did you talk to Spencer or did he talk to you with reference to assignment of that? A. Yes, sir, he did.

"Q. What did he say? A. He told me that he wanted Jim to assign it over to him because he was afraid he would give it to the

Townsend .Club Plan and Jim was kind of mixed up in that Townsend Club and he wanted him to have enough to live on and he was afraid he would give it all away when he got it.

"Q. Did Spencer say anything about intending to hold that for Jim's benefit? A. He said he wanted to see that Jim was taken care of when he got the money.

"Q. Did you ever know of Jim being extravagant? A. I have never known Jim to have enough to be extravagant. I don't think he ever had anything but an old age pension.

"Q. Do you recall him working on the WPA? A. Yes, sir.

"Q. Do you recall that he was staying at the office of Spencer? A. He stayed at the office and did the janitor work and sold the scrap paper, waste paper."

Respondent's attorney testified that he went to appellant for the purpose of having him reassign the property to respondent. As to what transpired we quote the following from the evidence of the attorney:

"A. I asked him about the assignment that Jim had given him. He said he had received that assignment and was holding it for Jim, and when the estate was settled he would see that Jim got everything that was coming to him. I asked him why he would not make a reassignment at this time. He said there was a lawsuit pending and he felt that it was better for all concerned for him to continue to hold the interest in his name because he could protect Jim better in that way."

The lawsuit referred to was a suit by the estate against another estate which did not concern or affect the issues presented in the present case. See Bovard v. Jones (Mo.), 142 S. W. (2d) 14. Appellant's fantastic story of how he acquired the property was not believed by the trial court. We find ourselves in the same position. We are of the opinion appellant acquired the assignment through fraud.

Appellant, however, insists that since the respondent testified the purpose of the assignment was to protect his interest against the claim of the holder of the $7,500.00 note, on which there was a balance due, he cannot invoke a court of equity to grant him relief. Appellant relies on the maxim, "He who comes into equity must come with clean hands." That maxim is supported by an abundance of authority. If respondent conveyed his property with intent to defraud his creditors then, of course, he is estopped to have it retransferred to him by an order of a court of equity. This question requires a close examination of the record. From what we have said above and from other matters appearing in the record, we find that there was in fact no creditor asserting a claim against respondent. Respondent had signed the note in 1924 as a straw man. This was evidently recognized by the holder of the note. Respondent at no time made a payment on the note. He later deeded the property to the real owner.

The holder of the note foreclosed under the deed of trust, and the agent of the holder testified in this case. His evidence disclosed that respondent was a forgotten man in the transaction. There was no evidence that anyone had ever notified him the note was in default or that a demand had been made upon him. The real owner of the property had reduced the debt from $7,500.00 to $4,000.00. The holder of the note purchased the property at the sale for $4,500.00. Interest in the sum of $587.49 and some taxes remained unpaid. The evidence justifies the assertion that the holder of the note considered the property as full payment of the debt. Note a portion of the agent's evidence:

"Q. Now then I will ask you, Mr. Patt, if a suit was ever brought against Jim Bovard or James Bovard, the one who signed that note, or any one else? A. No, sir.

"Q. On that deficiency? A. No, sir.

"Q. Did you ever at any time tell anyone that you were going to bring a suit for a deficiency? A. I am sure I never did. My attorneys may have said something."

The attorneys referred to did not testify that any attempt was made to collect the deficiency. On cross-examination, the agent testified, "Did the Scottish Union through you or did your office at any time instruct your attorney to file a suit to collect the deficiency? A. No, sir." The trial court found that appellant made false and fraudulent statements to the respondent with reference to inquiry having been made about the deficiency, with intent to alarm and confuse the respondent, and to induce him to transfer his interest in the estate to appellant. It is important to note that appellant was an administrator of the estate in which the respondent owned the one-sixth interest in question. In 30 C. J. S. 487, sec. 98, treating limitations of the rule under consideration, we read: "The clean hands maxim does not apply to every wrongful act of a party and should not be allowed to work injustice. The conduct of the other party may preclude its application." We are of the opinion the present case comes within that limitation. It would be a gross injustice to permit the appellant to retain the property of the respondent acquired through fraud as disclosed by the evidence. The evidence compels us to find, as did the trial court, that appellant took advantage of his position as administrator of the estate, his superior knowledge of the situation, and also the confidence respondent imposed in him, and used the deficiency question of the note as a trick to have title to the one-sixth interest transferred to himself. In such a situation appellant should not be permitted to plead estoppel against respondent because the fraud, if any, was of his own making.

Appellant complains that the trial court had no authority under the pleadings to make a finding that no consideration passed from appellant to respondent for the notes held by appellant. By the

pleadings that issue was before the court. Respondent pleaded failure of consideration. Appellant denied this allegation and placed the notes in evidence to support his contention. The trial court was bound to decide the issues thus presented and decided them against appellant. Appellant also pleaded res adjudicata, contending that a suit to try and determine title in the Jackson County Circuit Court at Independence was a bar to the present suit. Suffice to say that the issues in the present suit were not decided in that case and, more important, respondent was not a party to that lawsuit, and therefore any judgment entered therein would not be binding on him.

The judgment is affirmed. *Bohling, C.,* absent; *Barrett, C.,* concurs.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.