Keturah Ann Davie HERROLD, Appellant,

v.

George R. HART, Respondent.

No. 45046.

Supreme Court of Missouri.

Division No. 2.

April 9, 1956.

Motion for Rehearing or to Transfer to Court en Banc Denied May 14, 1956.

Dubail & Judge, Charles R. Judge, St. Louis, for appellant.

Ziercher & Tzinberg, Erwin Tzinberg, Clayton, for respondent.

EAGER, Presiding Judge.

In this proceeding appellant, plaintiff below, seeks to cancel a note and deed of trust and two general warranty deeds; these were supposedly executed by plaintiff's deceased aunt. Defendant filed a cross bill in ejectment. The parties will generally be referred to as they appeared below. The property involved is a three-story residence at 6306 Pershing Avenue in St. Louis County. Title to real estate is involved and we have jurisdiction. The trial court denied relief to plaintiff generally, without making any special findings of fact, and awarded possession to defendant.

Plaintiff was the residuary legatee, sole heir and closest relative of the deceased, Keturah F. Davie. The latter had never been married and was eighty-five years of age at the time of her death on March 9, 1953. The pleadings are somewhat informal, but no point is made as to their general scope, and we shall consider the action as one to cancel all four instruments on the ground of lack of consideration and fraud. Defendant does assert that fraud was not sufficiently pleaded, but both in the petition and in a reply plaintiff alleged that the "deed, in whatever manner executed, was in fact nothing but the fraudulent act of Defendant and part of his fraudulent scheme to deprive Plaintiff of her property." Under the facts of this case, although lacking much in detail, we consider the allegations sufficient; it seems improbable that plaintiff could have been more specific.

At the outset we are met with a Motion to Dismiss the appeal for alleged deficiencies in the statement of facts in appellant's brief and also in the statement of the Points Relied On. We find no omissions or misstatements of fact sufficient to justify a dismissal; some of the points presented in the motion refer to evidence concerning allegations in the pleadings which were abandoned at the trial; the others are not of such nature as to materially affect our consideration. Since this is an equity case with no findings of fact by the trial court, the statement of the Points Relied On is deemed sufficient. There was little or no opportunity to charge specific errors. The Points stated sufficiently assert the contentions of lack of consideration and fraud, and also the contention that all the evidence established plaintiff's right to cancellation. A similar objection to the insufficiency of the motion for new trial may be answered likewise. The Motion to Dismiss is overruled.

Keturah F. Davie was a retired schoolteacher, having retired about January 1, 1944; she had this residence built for her own occupancy in 1923, and by early 1948, if not sooner, she had fully paid off the incumbrance against it. Miss Davie had one brother (the father of plaintiff) who had been separated from his wife since about 1936 and who thereafter had lived continuously at his sister's home until his death on November 23, 1947. At some time in this interim the brother and his wife were divorced; he was in the real estate and building business. By his will, after making certain bequests, he divided the residue of his estate between his daughter, the plaintiff herein, and his sister Keturah. The record shows that the latter received, in 1950 and 1951 (beginning in February, 1950) cash from that estate aggregating $13,490.54; that included the proceeds of real estate sold. The brother's former wife, Virginia Ann Davie, frequently visited the sister.

There is much detailed evidence in the record concerning the income of Miss Davie. She received certain rentals from real property left by her brother; she received a pension as a retired teacher, and owned at least one piece of rental property

prior to her brother's death. Her income tax returns for the years 1947–1952, inclusive, show incomes of $1,344.40, $1,331, $1,675.79, ($292.92 of which was capital gain on sale of rental property) $2,417.73, $3,775.45, and $4,665.48, respectively. Beginning in 1950 she paid substantial nurses' and doctors' bills, aggregating $648 (1950), $893 (1951), and $4,351.83 (1952). Additional funds for these medical expenses were provided primarily by the sale of a $2,000 note and deed of trust in 1952, and of a $5,000 Savings and Loan Certificate in 1953. At her death on March 9, 1953, she had $3,173.77 in cash or credit balances, savings bonds of $196, a small life insurance policy, and household furniture. In addition, Miss Davie and plaintiff owned a piece of income real estate in which she had purchased plaintiff's interest, but which had thereafter been so conveyed by her as to create a life estate in Miss Davie, with remainder to plaintiff.

After the death of her brother in 1947, Miss Davie lived alone, except for domestic help and nurses, at times. She maintained a checking account in the First National Bank of St. Louis, and her monthly bank statements were offered and received in evidence covering the period from December 29, 1948, to March 31, 1953, but with certain periods missing, because those statements were not found in her possessions; her cancelled checks were received in evidence covering the period from December 20, 1948, to November 3, 1952, approximately six hundred forty-one in number. There was testimony, largely corroborated by the documentary evidence, that Miss Davie was meticulous about "banking" her money, and it would appear that all substantial disbursements, so far as known, were made by check. Except for the instruments in controversy here, Miss Davie's substantial business transactions appear to have been largely, if not entirely, handled by Mr. George Mayer who was Secretary of the Tower Grove Savings and Loan Association and was also in the real estate business. Mr. Mayer had been a friend of her brother and was the executor of the brother's estate. He was thus frequently in contact with Miss Davie after 1947 and had known her since 1937. Mayer handled the real estate from the brother's estate, both rentals and sales, sold a piece of Miss Davie's own real estate for her, collected rents for her, rendered accountings to her of her interest in the brother's estate, placed insurance for her on her home, and made substantial investments for her; an employee in his office prepared her income tax returns for several years prior to her death. Finally, after Miss Davie became very feeble, she gave Mayer written authority to pay bills for her out of moneys to her credit in his possession; this authorization was dated March 29, 1952, and was witnessed, and in fact recommended, by her physician. At this time Miss Davie told Mayer that she wanted him to look after her business affairs. Various disbursements were thereafter made by Mayer on her behalf, totaling $6,812.25, for which a full accounting was rendered, but Miss Davie continued to write certain checks for household expenses, nurses' and doctors' bills, etc. Her handwriting on some of these checks (the originals being here) is extremely shaky and feeble, if not illegible. Mayer was appointed Executor by the terms of Miss Davie's will and acted as such. He apparently knew nothing of defendant Hart; at least no such knowledge appears.

The physician who attended Miss Davie prior to January 15, 1952, was deceased. There was considerable testimony from persons relatively close to her concerning her physical and mental condition. From this it appears that she had a fall, and possibly a slight stroke, in November, 1949, and was in bed for about six weeks, substantially helpless; a neighbor found her on the floor, struggling to get up; her speech became thick; she read newspapers, but sometimes held them upside down; she remained upstairs until June, 1950. The neighbor, who was also a teacher, fixed the date of this attack as shortly after Miss Davie's birthday on November 4, 1949, probably about a week later. After that attack she had one or more practical nurses for a time. The first warranty deed purports to have been executed on November

15, 1949. Miss Davie appears to have recovered somewhat from this attack, but she remained feeble. In January, 1952, when Dr. Kirchner began attending her she had high blood pressure, was largely confined to her room, her heart was very irregular, and she had a kidney disorder; generally, she could answer questions, but at times was "remiss" in her conversation. In March, 1952, she fell out of bed, and on March 3rd she had a slight stroke; nurses were again procured for her. The doctor considered the written authorization to Mr. Mayer to be necessary. He testified that she had gotten progressively weaker since January 15, 1952; while not really abnormal mentally, she would drop off "into a stupor" when left to herself. By the time she signed the authorization to Mayer (March 29, 1952) it was becoming progessively more difficult for her to sign her name; she had arteriosclerosis, which does affect the mentality. Her signatures and writing ability around March 29, 1952, varied considerably.

In February, 1948, Miss Davie, through Mr. Mayer, had so arranged the title to her home as to vest it, by general warranty deed, in herself for life with power of sale, with the remainder to plaintiff. This deed was recorded on February 17, 1948. There was considerable evidence that Miss Davie talked frequently of plaintiff, her only niece, and expressed affection for her and her children. Certain of Miss Davie's friends asked her if she did not think she should sell her home and move into an apartment, but she expressed very definitely the view that she did not choose to do so, and that she never wanted to live anywhere else. Some of the latter conversations occurred in the spring of 1952, and in the fall of that year. She told one witness on March 13, 1952, that the house needed papering, but that "when I am gone Keturah Ann (plaintiff) can do her house as she wants"; she also said, as early as January, 1948, that since her brother was dead, she was going to leave everything to Mr. Mayer. A "real estate woman" talked to her about selling the house and she said that if she ever sold it Mr. Mayer would

handle it. She told Mr. Mayer that she was not going to sell the house, and he told her she would never be satisfied anywhere else. The latter conversation was in May, 1951.

The record shows substantially nothing about the respondent, his business, his background, or his financial status. We may assume that he was in the real estate business. He apparently began calling on Miss Davie occasionally, after the death of her brother; the origin of these visits is unexplained. He sent her flowers at times and took her candy and wine; the latter she said she did not drink. The sister-in-law and the schoolteacher friend apparently knew of defendant's visits, but never saw him there. The note and deed of trust in question are on printed forms; each is dated October 20, 1949; the note recites a consideration of $15,000 and is payable to the order of George R. Hart in monthly installments of $100 per month, beginning on December 15, 1949, at Hart's residence address. There is nothing to show that any payments were made. The first of the warranty deeds is dated November 15, 1949. It is entirely in typewriting, except for the signatures and certain ink inserts in the acknowledgment. The signature of the grantor appears about two-thirds of the way down the page, a little to the right of the center, and with no signature line appearing. The space left for the body of the deed is more or less cramped, while below the signature there is considerably more space than actually needed for the acknowledgment; the reservation of occupancy and the habendum, warranty, and witness clauses of the deed were single spaced, while the remainder (except the description) was double spaced, and the margins vary somewhat. This deed recites a consideration of $3,000 "and other monetary considerations," and provides that the party of the first part is to continue to occupy the property and pay all taxes, insurance premiums and maintenance costs for and during her natural life. The second warranty deed is dated March 31, 1952; it is likewise in typewriting with the last three clauses single spaced and prior clauses double spaced.

The signature of Miss Davie is in approximately the same location as in the first warranty deed, but a typed line, unusually long, appears somewhat below the signature. This deed recites that the property is conveyed under the powers conferred in a certain deed dated February 14, 1948. The deed of trust was recorded at 8:01 a. m. on March 10, 1953, the day after Miss Davie's death. The first warranty deed was recorded at 8:02 a. m. on the same day. It bore revenue stamps aggregating $22. The second warranty deed was recorded at 8:46 a. m. on March 14, 1953, four days later. Each of these instruments bears a certificate of acknowledgment by "Jos J. Dickman" of the same date as the respective instrument, but with the acknowledgment dates and the name of the grantor inserted with pen and ink on the two warranty deeds.

The only testimony concerning the execution of these instruments came from Joseph J. Dickman, the notary, who was also an accountant. He had known defendant Hart since 1942 or 1943, and around 1948 or 1949 started doing his "income tax work." He identified his notarial certificates on all three instruments. He said that the deed of trust was signed by Miss Davie at his home at about 11:00 a. m. on the date thereof; he did not remember the note, but said there were "other papers there"; that Mr. Hart brought Miss Davie there; he had never seen her before, but described her in some detail and said she walked with a "sort of a drag on one side, a sort of jumpy walk." He further testified: that Mr. Hart produced a rather large brown envelope and started to count out five-hundred dollar bills and "I kind of opened my eyes"; and he (Hart) said " 'There are fifteen thousand dollars here.' And that is all." He described in detail the positions of the parties at the table, and said that the "possession" of the money "changed." He did not see any receipt signed. This witness further testified: that the first warranty deed was signed by Miss Davie on November 15, 1949 (less than a month later) at her home; that Miss Davie, Mr. Hart and the witness were the only

ones present; the witness had met Mr. Hart at his home from whence they went over together; that she was not so "spry" as on the preceding occasion; that the deed was signed at the dining room table, after Mr. Hart produced the instrument; Miss Davie had been slow in coming to the door and apologized, saying that she had no help; at that time more money was produced in cash from an envelope, again in five-hundred dollar bills, he "believed"; nothing was signed at that time except the deed, the witness saw no other papers, and the only conversation about the matter at hand was that Mr. Hart (he thought) told her "what it was" and said, " 'Here is the additional money.' That was all." He recalled that Mr. Hart moved a chair for Miss Davie, and that she "glanced over" the deed, "she looked at it," and signed it. There is no evidence of a surrender of the note or deed of trust, of any closing statement or of any other accounting between the parties. This same witness testified further: that on March 31, 1952, shortly before 6:00 p. m. and in a pouring rain, he again met Mr. Hart at his home and went with him to Miss Davie's residence where a maid admitted them; that they found her propped up in bed in a room on the second floor; Mr. Hart said: "Miss Davie you remember Mr. Dickman * * * a notary public"; that Dickman told her she was looking fine and he testified that "she was," with complexion and eyes "nice and bright"; that someone said, however, that she had suffered a relapse and had fallen; that there was no discussion of the instrument to be executed; the nurse merely laid a magazine on Miss Davie's lap, she took Dickman's pen and said: "Well, I have to make this good. This is important," and she signed it, and "that was it"; that she did not read the deed; the witness said that she signed rather slowly but "made each letter with a certain amount of determination," and the witness said to her "that's fine." This instrument, like the others, was immediately given by Dickman to Mr. Hart. The witness also recalled that he asked the nurse, who was in and out, for a drink of water. Dickman thought he might have taken about fifteen

acknowledgments for Hart over a period of years.

An examiner of questioned documents, Karl Schottler, testified for plaintiff after having examined photostats of the several instruments (presumably made from the recorder's photos) and also Miss Davie's signatures and writing on many checks over a period of several years; he produced as illustrations enlarged photostats of some of the latter, and of her signature on the written authority to Mayer signed on March 29, 1952. He testified: that in his opinion the signatures on the instruments in question were her signatures, but that the signature on the second warranty deed could not have been made on its date, March 31, 1952; that her signatures up to approximately September 20, 1950, differed from those thereafter; for one thing the earlier ones were steadier, smoother, and more horizontal, and also in them the "K" and the "e" in "Keturah" were separated, whereas in all later signatures found these letters were joined in a continuous movement. (We have examined many of these signatures and the difference in the joining of the letters seems definitely to appear.) After March 6, 1952, the signatures became more feeble and uneven. Comparing the signatures on the second warranty deed, dated March 31, 1952, with that on the authority to Mayer, dated March 29, 1952, he said that there was "terrific strain" in the writing on the latter, while that on the former was in rhythm and with very little effort. (And we note here that the signature on that deed appears to be smooth, strong and even, with the "K" and "e" definitely separated; it is markedly different from that on the authority to Mayer.) He admitted that the later signatures varied somewhat, and that in certain respects photos of photostats are of little value because of loss of detail; here, however, he said that they permitted ample opportunity for considering the formation of the letters.

Francis M. Rohan, a lawyer and Assistant Secretary of the Land Title Company of St. Louis, testified that he had known defendant for about twelve or fourteen years; Hart brought to him the deed of trust and first warranty deed, probably in 1951, and the witness looked up the property in his records; he found (as already discussed) that Miss Davie had only a life estate with the power of sale, and he told Hart that he "should rearrange the deed," so as to show the exercise of the power of sale; he suggested the wording which should be included in a new deed. He also told Hart that he had been very foolish in not recording the instruments. Much later he saw the second warranty deed, executed, and as it now appears, but not recorded. He again warned Hart about the failure to record.

On January 18, 1950, defendant had photostats made of the note, deed of trust and first warranty deed, asking that notations be made on the copies of the date on which they were made. Such was done, and the photostats, so endorsed, are in evidence. At the death of Miss Davie the certificate of title to the property was in her safe deposit box. There is no showing of any title examination for defendant or of the issuance of a title policy or certificate to or for him at any time. Under date of October 5, 1950, a policy of fire insurance with extended coverage was issued on this property to Miss Davie, through Mr. Mayer, for a period of three years; it contained no mortgage clause or "loss payable" clause; there was no showing that any insurance was issued to defendant at any time. After the date of the first warranty deed Miss Davie continued to pay all taxes, maintenance, and repairs, and she paid $398 for painting the house in November, 1949, the very month in which the first deed was supposedly executed. While there is no direct evidence of the value of this property, defendant claims to have paid a total of $18,000 for it, so we may assume that such was its approximate value. It was stipulated that Miss Davie owned the fee simple title prior to the transaction of February, 1948, in which she placed the remainder interest in plaintiff. The note and deed of trust were not cancelled until July 7, 1955, more than two years after the filing of this suit. During the period of all these transactions plain-

tiff lived in Canton, Ohio, with her husband and children; she had visited her aunt, probably twice, during this period.

■ The trial court found the issues generally for the defendant both on plaintiff's petition and on defendant's cross bill, and ordered that defendant have possession. We have determined that this judgment should be reversed. We recognize fully that the evidence to support a decree of cancellation should be clear, cogent and convincing; we also recognize that deference, or "due regard," should be accorded to the opportunity of the trial court to judge the credibility of the witnesses. Section 510.310 RSMo 1949, V.A.M.S.; Basman v. Frank, Mo., 250 S.W.2d 989. However, it is our prerogative and our duty to review such a case de novo, to make our own findings, and to determine for ourselves the weight and value of the evidence. Dreckshage v. Dreckshage, 352 Mo. 78, 176 S.W.2d 7, 14; Meyer v. Schaub, 364 Mo. 711, 266 S.W.2d 620. So doing, we conclude that a lack of consideration for these instruments was sufficiently established, as was also fraud. More specifically, we think that the testimony of the notary-witness Dickman is largely unbelievable when considered alone, and that it is overwhelmed by the great multitude of circumstances and evidence to the contrary, both oral and documentary. A study of this entire record brings that conclusion, without leaving a substantial doubt.

■ It has always been held that fraud may be proven by circumstantial evidence, if that evidence affords a clear inference of fraud, and amounts to more than a mere suspicion or conjecture. Castorina v. Herrmann, 340 Mo. 1026, 104 S.W.2d 297; Conrad v. Diehl, 344 Mo. 811, 129 S.W.2d 870; 37 C.J.S., Fraud, § 115, p. 436. And it is likewise held that a concurrence of circumstances, or of "badges of fraud," may warrant an inference of fraud, although each such circumstance may, in itself, be trivial. Castorina v. Herrmann, 340 Mo. 1026, 104 S.W.2d 297, 302; Matz v. Miami Club Restaurant, Mo.App., 108 S.W.2d 975, 979; Basman v. Frank, Mo., 250 S.W.2d 989, 994; Toomay v. Graham, Mo.App., 151 S.W.2d 119, 125. And the fact that some of these circumstances may arise from defendant's own evidence, does not prevent them from constituting substantial evidence of fraud. Castorina v. Herrmann, supra. For cases applicable in principle to the present situation the reader may examine: Colquitt v. Lowe, Mo., 184 S.W.2d 420; Frey v. Onstott, 357 Mo. 721, 210 S.W.2d 87; Basman v. Frank, Mo., 250 S.W.2d 989; Conrad v. Diehl, 344 Mo. 811, 129 S.W.2d 870; Castorina v. Herrmann, 340 Mo. 1026, 104 S.W.2d 297; Meyer v. Schaub, 364 Mo. 711, 266 S.W.2d 620; Seligman v. Rogers, 113 Mo. 642, 21 S.W. 94; Bovard v. Bovard, Mo., 180 S.W.2d 592. In those cases and others the courts have considered as circumstances or indicia of fraudulent conduct, usually in connection with conveyances to the defendant: the age and physical condition of the grantor; the disparity in the ages of the parties; the financial condition of the grantor and his or her lack of need for the money said to have been paid; any unusual method of handling the transactions; a failure to record the instrument; evidence of secrecy on the part of the grantee; a failure to show that the grantee was financially able to pay the alleged consideration; any unusual interest of the grantee in the grantor; the circumstance of allegedly paying large sums in cash; the fact that the grantee had no title examination made before the transfer; the unreasonableness of the transaction as a whole; the execution of deeds without reading them; who selected the scrivener and who supervised the execution; the fact that the alleged consideration cannot be traced into the grantor's funds, or assets, particularly if he or she is shown to have been careful in business affairs; and the fact that the alleged ownership of the grantee was concealed. Nearly all of the foregoing elements are present here.

This case is not decided as one of constructive fraud, as counsel for defendant suggest it must be; it is rather a case of actual fraud, reasonably inferred from all the attendant circumstances. And we note

**56**

that even in constructive fraud proof of a fiduciary relationship is not always necessary, as counsel insist; it is merely an alternative basis of the doctrine. Here, we do not hold that the parties were in a fiduciary relationship, and we need not do so.

■ Actually the questions of lack of consideration and fraud in the present case are so interwoven that they may be considered as one. If, in fact, defendant did not pay Miss Davie $18,000, then he was, and is, necessarily guilty of actual fraud, and the whole transaction fails. Defendant has staked his case on that contention, and he certainly claims no gift. If the claimed consideration was not paid all the deeds are void, and equity may and should intervene. Cook v. Branine, 341 Mo. 273, 107 S.W.2d 28; Meyer v. Schaub, 364 Mo. 711, 266 S.W.2d 620; Finnerty v. John S. Blake & Bro. Realty Co., 276 Mo. 332, 207 S.W. 772. The last warranty deed may not have been essential to the claim of title, but the circumstances concerning it are most certainly to be considered on the issues presented here. The present decision is not based upon undue influence, which is not in issue here; we note by analogy, however, that in various cases the courts have considered in that connection many of the same elements as are listed above. Bohnsack v. Hanebrink, Mo., 240 S.W.2d 903; Dimity v. Dimity, Mo., 62 S.W.2d 859; Manahan v. Manahan, Mo., 52 S.W.2d 825.

■ In order to support a decree of cancellation, the evidence must, of course, exclude mere conjecture and guesswork. We think it does so here. Counsel suggest, citing certain cases at law, that the evidence should exclude every other reasonable hypothesis except fraud and lack of consideration; although the matter is largely academic on this evidence, we prefer to follow here the equity rule that the evidence shall be so clear and convincing as to exclude doubt from the mind of the court. Decker v. Fittge, Mo., 276 S.W.2d 144; Swon v. Huddleston, Mo., 282 S.W.2d 18. So far as we are concerned, the evidence here

meets that test, despite the affirmative testimony of the notary. Counsel also cite cases dealing with the contention that evidence of physical facts and the results of inter-acting forces may not overcome affirmative testimony unless a "very clear case" is established. That is true, but the situation here is entirely different, this being an equity case with no analogous situation presented.

The briefs on both sides discuss authorities concerning the burden of proof and the burden of proceeding; plaintiff's counsel contends that, since the issues on plaintiff's part are largely negative in character and knowledge of the facts is within the control of the defendant, the burden (of proof or of proceeding) is upon defendant. Such a principle has been declared, but it is said to be applicable when the information or evidence is peculiarly or entirely within the other party's control or knowledge. It is unnecessary to decide that question here. We are satisfied that the requisite burden has been met by plaintiff.

The deceased was a very meticulous woman in the handling of her money, and no part of the claimed $18,000 of consideration was found in her assets or estate; it would be (and is) highly unusual, to say the least, to pay the consideration of a bona fide business transaction, first $15,000 and then $3,000, in five-hundred dollar bills under the circumstances asserted here; there is absolutely no showing of defendant's background, business or financial status, or of the source of this money, and it seems to us that even if he was prohibited from testifying himself, some other evidence of his business and financial status could and should have been produced. It is fairly shown that Miss Davie had no particular need for money at the date of the note and deed of trust; her needs were modest, she had substantial bank and credit balances, and she had an income which seems to have met her needs; she had, at that time, an early certainty of substantial payments from her brother's estate, which was nearing the end of probate. The two warranty deeds are highly peculiar on their very faces, raising a reasonable inference:

that they were written to fit the signatures, rather than the contrary; the smooth, bold signature on the warranty deed of March 31, 1952, is wholly inconsistent with the other writing of Miss Davie of about that time; the deeds are alleged to have been executed with almost no discussion, a very peculiar circumstance in itself; complete secrecy was maintained and none of the instruments were recorded during Miss Davie's lifetime, in spite of specific advise to do so; for some reason defendant thought it advisable to have photostats made of the first three instruments, retaining both the originals and the copies; the note and deed of trust were not surrendered, nor was any accounting made, when the first warranty deed was executed; the deed of trust and the first warranty deed were recorded in the first available minutes on the day following Miss Davie's death; by the failure to record during the grantor's lifetime defendant voluntarily foreclosed himself from all practical possibility that he would be permitted to testify; the supposed loan to Miss Davie was in excess of 83% of what defendant himself recognized to be the value of a twenty-six year old residence; Miss Davie spent, in addition to taxes and repairs, $398 to paint the house in the very month in which the first warranty deed is dated; she apparently had a slight stroke during that same month, and was never really well thereafter; she was eighty-two years old at that time and the evidence indicates a strong probability that she was sick and in bed on November 15, 1949, when it is claimed she appeared at the door alone, and at the dining room table for the execution of that deed. The procuring of the correction deed was delayed long after defendant was advised of its desirability, and the defendant did not remember to insert in it the reservation of the right of occupancy which he had used in the first deed; defendant was not covered by any mortgage clause in the only insurance policy mentioned; Mr. Mayer, who handled all of Miss Davie's other business transactions and was her most trusted adviser, was never consulted; the visits of defendant began only after the death of the brother of Miss Davie; the sale of the home was wholly inconsistent with grantor's many conversations on the subject, which were continued long after the execution of the first warranty deed; it was also inconsistent with her prior conveyance to the plaintiff, subject to her own life estate; and Miss Davie kept the title certificate. Moreover, it seems to us that Mr. Dickman, acting merely as a notary, and testifying from no records except the instruments themselves, remembered entirely too much concerning the various and sundry details and conversations of the three occasions in question, when he was so vague about his other transactions for the defendant. His testimony is in irreconcilable conflict with the vast array of circumstances related, and we feel compelled to give credence to the mute and inalterable evidence afforded by these circumstances. Sometimes actions do "speak louder than words." Toomay v. Graham, Mo.App., 151 S.W.2d 119, 126. When so many badges and indicia of fraud and imposition are present, there should certainly be more explanation of the peculiar transactions than is found here.

It is perhaps unfortunate that courts are not endowed with some occult power with which they might search the minds and souls of litigants in cases such as this. We do not, however, profess to have such, and we rely on the record as a whole. With all deference which we may reasonably give to the general findings of the trial court, we find it our duty here to decree cancellation. The cause will be reversed, with directions to the trial court to enter its decree cancelling all the instruments in question and dismissing defendant's cross bill. It is so ordered.

All concur.