Lula Anna DOPP, Individually and as Trustee for Margaret T. Piper; Margaret T. PIPER, Individually; and Lula M. HOOVER *v.* SUGARLOAF MINING COMPANY, An Arkansas Corporation; Spencer BOVARD, Individually and as Administrator of the Estate of Patricia Ann Bovard; et. al.

85-98                                        702 S.W.2d 393

Supreme Court of Arkansas
Opinion delivered January 13, 1986
[Rehearing denied February 24, 1986.*]

---

* Purtle, J., not participating. Hickman, J., would strike brief.

*Hardin, Jesson & Dawson*, by: *Betsy Hall*, for appellant.

*Harper, Young, Smith & Maurras*, by: *Robert Y. Cohen, II*, for appellee Spencer Bovard, individually and as administrator.

STEELE HAYS, Justice. This case concerns the validity of a 1946 declaration of trust which the appellants claim is either a forgery or was obtained by fraud. The disputed instrument, which we will refer to as the Bovard trust, affects the ownership of an undivided one-third interest in 2,883 acres in Sebastian County, Arkansas, containing valuable coal deposits. The chancellor upheld the Bovard trust, but we must reverse that ruling.

Appellee, Spencer Bovard, is the surviving spouse of Dorothy Bovard, who died intestate in 1965. Appellants, Lula Anna Hoover Dopp and Lula May Hoover Deleon, are the widow and daughter of John A. Hoover, who died intestate in 1948. Appellants are the undisputed owners by descent of an undivided two-thirds of the Sebastian County lands. This litigation involves the remaining one-third.

In August, 1946, John A. Hoover bought the entire tract for $35,000 from the First National Bank of Ft. Smith, trustee of the Northwestern Coal and Mortgage Company, Inc. On June 10, 1947 Hoover and his wife executed an agreement with Margaret T. Piper reciting that the three of them had acquired the property at a cost of $37,500, purchase price and expenses; that Margaret T. Piper had given John Hoover $12,500 and the Hoovers had paid the balance in cash and by a loan of $11,000 from the First National Bank of Ft. Smith, secured by a mortgage on the property. Under the agreement Mrs. Piper would not be responsible for any part of the $11,000 note and mortgage and because she did not want her interest to appear of record, the Hoovers were to hold the property in trust for her. The agreement provided that at the death of Mrs. Piper her interest would terminate.

The Bovard trust purportedly bears the signature of John Hoover, dated November 6, 1946, and recites that Hoover holds title to the land in trust for himself, Margaret Piper and Dorothy Bovard, the wife of Spencer Bovard. The Bovard trust makes no mention of Lula A. Hoover, nor of the fact that Margaret Piper's

interest is for life only, nor that she did not want her interest to appear of record. It is undisputed that Mr. Guy Green, an attorney in Kansas City representing John Hoover, prepared the Piper trust. Spencer Bovard contends that Green prepared the Bovard trust as well. The Piper trust was recorded on February 19, 1948, the Bovard trust on May 7, 1948.

### Proceedings Below

The current litigation began in 1981 when Sugarloaf Mining Company filed this interpleader of coal royalties. Named as defendants were Lula Anna Hoover Dopp, Lula May Hoover Deleon, Spencer Bovard, Margaret T. Piper, James H. Anderson, a lawyer hired by Spencer and Dorothy Bovard in 1963 to pursue their claim, and Marie Nugent, the widow of Anthony P. Nugent, Sr. Mr. Nugent was also hired by the Bovards in association with Mr. Anderson. The Bovards had contracted with Anderson and Nugent for one-half of any recovery and had given them a mineral deed conveying one-half of any minerals recovered from the lands.

By various cross-pleadings the issues were joined. Mrs. Dopp and Mrs. Deleon relied on the Piper trust, claiming the Bovard trust was a forgery or was obtained by fraud. Spencer Bovard relied on the Bovard trust and alleged that Anderson and Nugent had failed to pursue the Bovard claim.

The chancellor upheld the Bovard trust, and Mrs. Dopp and Mrs. Deleon have appealed. They submit the chancellor erred in not finding the Bovard trust was barred by forgery or fraud, in allowing the introduction of inadmissible evidence, and in not sustaining the claims of laches and adverse possession. We find the evidence clearly preponderates against the claim of Spencer Bovard, that the Bovard trust is either a forgery or was obtained by fraud.

### Background Facts

This is an extraordinary case. The factual issues, extending back over forty years, are complex. There are accusations of murder. Except for Mrs. Dopp, Mrs. Deleon and Mr. Bovard, the individuals whose testimony could be material are now dead: John Hoover in 1948, Dorothy Bovard in 1965, Margaret Piper in

1979, Guy Green in 1950 and, others. Two of those deaths were violent: John Hoover was murdered on the night of February 10, 1948; Dorothy Bovard died on February 3, 1965 from a self-inflicted gunshot wound to the head. The murder of John Hoover was never solved. Mrs. Dopp and Mrs. Deleon testified to their firm belief that Spencer Bovard was responsible for John Hoover's death. Surprisingly, the record is devoid of any response from Mr. Bovard to those startling accusations.

## De Novo Review of Chancery Cases

Ordinarily, we do not reverse a chancellor where the decision turns largely on disputed facts and witness credibility, as we accede to his superior position to observe the witnesses and gauge their demeanor. But witness demeanor is simply one criterion of determining credibility, and when one version of the facts cannot be reconciled with undisputed versions, or is rendered too implausible to be believed when measured against common experience, then demeanor cannot override other equally reliable criteria. Moreover, chancery cases are tried de novo and when we find our own review of the record to be in marked disagreement with the chancellor's findings it is our duty to reverse. ARCP 52. *Rose* v. *Dunn*, 284 Ark. 42, 679 S.W.2d 180 (1984); *Walt Bennett Ford* v. *Pulaski County Special School District*, 274 Ark. 208, 623 S.W.2d 186 (1981).

## Hoover Testimony

In January 1945 the Hoovers were living in Kansas City. Lula May Hoover worked in a coffee shop frequented by Spencer Bovard. When he asked her for dates, she told him he could come to her home and meet her parents, which he did. Over the months that followed he became like a member of the family, even proposing marriage to Lula May Hoover.

During his visits, Spencer Bovard began to discuss with John Hoover the land in Arkansas. It had belonged to the Northwestern Coal and Mortgage Company which had dissolved in 1922. Some of the stock belonged to the estate of Spencer Bovard's great uncle, John H. Bovard. Spencer Bovard was a co-administrator of the estate.

John Hoover had mining experience and with Spencer

Bovard's encouragement he became interested in acquiring the land, which could be bought for $35,000. By corresponding with Mr. S.B. Stevenson, Vice President of the First National Bank of Ft. Smith, and with the partial backing of Margaret Piper, John Hoover managed to arrange the purchase, with the bank agreeing to lend him $11,000 of the purchase price. Guy Green handled the necessary legal work.

Lula May Hoover was employed out-of-state after April of 1945 but while at home on visits her father would discuss plans to purchase the property. He proposed to sell their home and a rent house in Kansas City and to borrow on his life insurance. The family would move to Arkansas and use the coal and timber from the land to pay off the balance of the purchase price. By August, 1946, her father had bought the land with Margaret Piper's help. He was excited about the prospects and told Lula May that Spencer Bovard had made it possible for him to acquire the land, that he hoped Spencer would help him develop the property and when the original investment had been repaid, he thought he would give Spencer a one-third interest.

Lula May Hoover returned to Kansas City in January, 1948. By then her parents were at the point of moving to Arkansas. She testified that something had happened to change her father's attitude toward Spencer Bovard. On Sunday, February 8, Lula May and her father drove to another part of the state on business. Her father was so upset his driving was affected and she took the wheel while he discussed his affairs in resume. He told her he planned to disassociate himself immediately from Spencer Bovard. Although he had discussed other intentions with her, he said they would never come to pass. She took it that while she was away Spencer had been in Arkansas to pump water from an abandoned mine shaft referred to as "the old Northwestern," but that for reasons he did not explain her father did not intend to have any further connection with Spencer Bovard. She testified that on Tuesday, February 10, her father was with Spencer Bovard and that evening he attended the Golden Glove fights but never came home. His body was found on February 14 in a remote section of Kansas City, bound and gagged in the backseat of his car. He had been struck on the back of the head but had died from smoke inhalation from an attempt to burn the interior of the car. Mrs. Dopp and Mrs. Deleon testified to actions and statements by

Spencer Bovard after the death of John Hoover which raised their suspicions to the point they became terrified of him, and wanted no further contact with him.

## Bovard Testimony

Spencer Bovard testified that because of Hoover's mining experience he told Hoover about the Northwestern property and its potential. Bovard said that he, John Hoover and Margaret Piper decided to go into business together as partners, though Mrs. Piper was to have no active participation. Bovard said he was to come to Arkansas to pump out the old Northwestern mine and to promote coal leases to be sent back for Hoover's approval.

According to Spencer Bovard, Guy Green prepared the Bovard trust and John Hoover signed it in his presence in Guy Green's office. Bovard said he later gave the original of the Bovard trust to Green and Green lost it. He said the land was put in his wife's name because she put up part of the purchase price.[1]

## Bovard v. Bovard

Turning to the proof that convinces us the Bovard claim is without merit, perhaps the most dramatic segment of the record involves a trial between Spencer Bovard and his uncle, James Bovard, decided by the Supreme Court of Missouri in 1944.[2] The facts of that case provide a revealing profile of Spencer Bovard, which seriously undermines his credibility and renders his entire claim suspect. From that record it is shown that Spencer Bovard set out on a carefully conceived plan, pursued over a considerable period of time, to defraud an infirm and nearly destitute uncle of his share of the John H. Bovard estate, valued in excess of $10,000.

James Bovard, who was elderly, virtually deaf and trusting of Spencer Bovard, signed several sheets of blank paper at Spencer Bovard's request, on the latter's representation that he

---

[1]   In 1975 Spencer Bovard obtained a quit claim deed from his son, Michael Bovard, and his wife and was appointed administrator for the estate of his daughter, Patricia Bovard, who disappeared in 1969 and was declared legally dead.

[2]   The entire opinion (*Bovard v. Bovard*, 180 S.W.2d 592, 352 Mo. 961) was introduced without objection.

was trying out some new paper in connection with a printing business. The papers were later filled in as a deed of trust, an assignment, a receipt for $4,000 and two promissory notes, each for $2,000. When James Bovard sued to set aside the fraudulent instruments Spencer Bovard's explanation was that he had lent his uncle $4,000 as a down payment on a hotel James Bovard was purchasing. He claimed he later cancelled the debt when James Bovard transferred his interest in the John Bovard estate to him. James Bovard testified that he had never considered purchasing a hotel and never intended to sign any documents to Spencer Bovard. The trial court and the Missouri Supreme Court, noting that James Bovard had never earned more than $100 per month working at odd jobs, for W.P.A. and the like, termed Spencer Bovard's testimony "preposterous," "unbelievable," and "fantastic." With no dissenting view the Missouri Supreme Court upheld the voiding of the documents as fraudulent.

### Testimony of Anthony Nugent, Jr.

But there is more recent proof of similar methods. Anthony Nugent, Jr., son of the attorney hired in 1963 by the Bovards, a former Assistant United States Attorney for Missouri and now a member of the Missouri Court of Appeals, testified that after his father's death he investigated the case to determine whether his stepmother might have a salvageable interest in the property. He said that at a meeting with Spencer Bovard in 1975, Mr. Bovard specifically stated that he had forged the signature of Dorothy Bovard on the mineral deed and, therefore, Bovard argued, neither Mr. Anderson nor Mrs. Nugent had any interest in the property purportedly conveyed by the mineral deed, nor any contract upon which to base further representation of Mr. Bovard, since the contract would fail for lack of consideration. Whether Spencer Bovard actually forged the name of Dorothy Bovard to the mineral deed, or merely claimed to have done so, matters little. In either event the result is the same—a demonstrated disdain for the truth and a willingness to engage in calculated fraud. Nor can we find in the record where Mr. Bovard denies this damaging testimony, only that he did not recall making such a statement.

### John H. Bovard Estate

Worthy of note is the proof that while Spencer Bovard was serving as a co-administrator of the estate of John H. Bovard, two of the heirs petitioned for his removal on grounds of unfitness, accusing him among other things of a failure to account for moneys collected by him but belonging to the estate. The petition had the endorsement of Spencer Bovard's co-administrator. From what we can determine, these allegations were not decided on the merits, but it does Mr. Bovard no credit that three members of his family, two aunts and his own co-administrator, considered him unworthy of the trust reposed in a fiduciary.

### Buick Title Certificate

We also find proof that after the death of John Hoover, Mr. Bovard retained a Buick automobile registered in the name of John A. Hoover, and when his widow took legal steps to recover it, in the course of those proceedings Mr. Bovard admitted signing John Hoover's name to an application for title, transferring the ownership to Dorothy Bovard. This was done, he said, with John Hoover's approval.

### Testimony of Wilbur Stillwell

There is the testimony of Mr. Wilbur Stillwell of Kansas City, an intimate friend and business associate of Margaret Piper, and the executor of her estate. He testified that some years before Mrs. Piper's death in 1979 she and Mr. Bovard discussed the land. Mr. Bovard, he said, approached Mrs. Piper with the intent of seeking her cooperation. Stillwell described it as, "An unpleasant thing." He said, "She didn't trust him. It seemed to her that he projected the image of an opportunist. A person who sought to impose himself on a situation for his own gain. She had very little regard for Mr. Bovard."

### Courtship of Lula May Hoover

Another insight concerning Mr. Bovard is found in the testimony of Mrs. Dopp and Mrs. Deleon, undenied by Spencer Bovard, that while courting Lula May, even proposing marriage, Spencer Bovard posed as single, when in fact he was married and

the father of two children.[3]

### "Hoover Put Up Nothing"

Spencer Bovard claims he and Margaret Piper put up all the money for the purchase, that John Hoover put up nothing. We find that testimony utterly unsupported by the record and wholly incredible. All of the documentation and correspondence regarding the purchase involves John Hoover, there is no suggestion that Spencer Bovard or Dorothy Bovard are interested in the purchase. Of course, Margaret Piper's name was also omitted, but that was at her direction. There is no intimation that Spencer Bovard, like Mrs. Piper, wanted his interest undisclosed. Moreover, there is considerable correspondence between John Hoover and S.B. Stevenson, Vice President of the First National Bank of Ft. Smith, concerning the purchase. In all of this correspondence there is no suggestion that Dorothy or Spencer Bovard are interested in the purchase. One of Mr. Stevenson's letters notes the cash value of Hoover's life insurance.

Mr. Bovard's testimony is improbable from another angle—he suggests that the $11,000 mortgage for the balance of the purchase price was the extent of John Hoover's contribution, but he also testified that the understanding was that John Hoover was to recover this amount before Bovard and Mrs. Piper would receive any return on their investment from coal and timber sales—an absurd arrangement. If this were so, Hoover, who had put up nothing, would recover the $11,000 out of coal and timber sales before Piper and Bovard were to start receiving earnings.

### Two Trust Instruments

Equally implausible is Mr. Bovard's explanation for why there were two trust instruments. He said Mrs. Piper was not satisfied with the first, the Bovard trust, and wanted a second one prepared to set out her interest more specifically, so the Piper trust was prepared. That explanation makes little sense in that the second instrument gives her only a life interest, whereas the

---

[3] Mr. Bovard testified that he met John Hoover first, and only met Lula May Hoover some five or six months later, but the decree below makes a specific finding that Bovard met Hoover through his friendship with Lula May, not vice versa.

Bovard trust gives her an interest in fee.[4] What this strongly suggests is that whoever prepared the Bovard trust did not know the specifics of Mrs. Piper's participation in the venture. That rules out Guy Green, who, because he prepared the Piper trust, knew the extent of Mrs. Piper's interest.

### The Bovard Trust

Spencer Bovard claims that Guy Green prepared the Bovard trust. We find that unbelievable. In the first place, on May 12, 1948, Guy Green filed a claim against the estate of John Hoover for the balance due him for legal services as of the date of death. The claim, verified under oath, is carefully itemized as to work performed by Green between February, 1946 and April, 1947, which includes the date of the Bovard trust (November 6, 1946). The claim specifically mentions the preparation of the Piper trust, and some three or four coal leases, including the lease to Abner Hobbs. It states that fourteen days were devoted to acquisition of the Northwestern stock and in preparing and approving various instruments in connection with the purchase. The total charge is $1,000, billed to Hoover alone, and shows $350 paid on account by Hoover on February 17, 1947. The statement makes no mention of the Bovard trust and we think it most unlikely that the same attorney would have prepared two repugnant instruments affecting the same property. The statement does mention conferences with Spencer Bovard, referred to as Mr. Hoover's "agent and associate." But if Bovard were an equal owner, as he claims, why would words have been used which relegated him to a lesser status, and why would the charges for legal services not have been addressed to both of them? We reject as well Mr. Bovard's claim that he hired Guy Green in 1948 to protect his interest against the Hoover estate. It is enough simply to note that no claim was filed on Bovard's behalf by Green or anyone else against the estate of

---

[4] The decree attributes this lowered interest to a "misdeed" by John Hoover. We find no basis for that conclusion except conjecture. The Piper trust, which Mrs. Piper signed in June of 1947, provides in clear and repeated language that her interest is for life only. Some years later Mrs. Piper signed yet another document at the request of a coal lessee, confirming the fact that her interest was for life only. Granted, Mr. Stillwell testified that she may have thought originally her interest was absolute, but what may well have been simply a misconception cannot translate into a "misdeed" when the instrument creating the interest plainly states it is for life only and bears her signature.

John Hoover and it would not have been ethical for Green to have filed such a claim.

### No Original of Bovard Trust

We note, too, the absence of the original of the Bovard trust, with no very plausible explanation for its disappearance—only that Bovard says he gave it to Guy Green and Green lost it. The upshot is we are left with a photocopy (see appendix) of the most inferior quality—a negative, white on black reproduction—which defeats any reliable scrutiny into the genuineness of the signature or of the document itself.

### Bovard Never Claimed Ownership

Particularly persuasive is the testimony by the appellants and by Marvin and Orval Hobbs, that neither before nor after the death of John Hoover did Spencer Bovard ever mention, even remotely, owning a part of the land in Arkansas. It is inconceivable to us that he would not have done so. Even if not while John Hoover was alive, the probability that after Hoover's death, Spencer Bovard, whose interest was dependent on an unrecorded declaration of trust subject to being defeated at any time by an innocent purchaser, would not have said something to John Hoover's wife and daughter at a decent interval after the funeral, is unthinkable. Mrs. Deleon testified that it was not until November of 1949, nearly two years after the death of John Hoover, that she first learned of the Bovard trust, and then evidently by chance. Nor does Spencer Bovard deny this testimony.

### Testimony of Marvin Hobbs

We are impressed by the testimony of Marvin Hobbs and Orval Hobbs, whose father, Abner Hobbs, mined coal on the Northwestern lands from 1936 to 1951. Mr. Hobbs had leased a coal mine from John Hoover. Marion Hobbs, an uncle, also leased a mine from Hoover. Marvin Hobbs testified that he had lived near the property all his life, had worked in the coal mines with his father, that his father never conducted any business negotiations concerning the coal lease with anyone other than John Hoover. He said he saw Spencer Bovard with John Hoover several times, that Hoover referred to Bovard as a friend that "just came down

with him," that Hoover never indicated that Bovard had any interest in the property. Hobbs said he never saw Bovard mine any coal, and, significantly, he never saw Bovard around the property after John Hoover died, nor heard Bovard ever claim any interest in the property. At the trial he said he had not seen Mr. Bovard from the time of Mr. Hoover's death "until this morning."

### Testimony of Orval Hobbs

Orval Hobbs testified that he had lived near the property for thirty-five years, working in the mines with his father and brother. He said he made several trips to Kansas City with his father to talk to John Hoover about leasing the old Northwestern mine but Hoover wouldn't lease the Northwestern, so they leased another nearby. He said Spencer Bovard never said he owned any interest in the property and was not present during the negotiating sessions, that they leased the land from John Hoover. He said John Hoover told him he and Spencer Bovard were going to pump water out of the old Northwestern mine and that was why Hoover did not want to lease the old Northwestern. He said they never got much water pumped out because of problems with the motors. He testified that Spencer Bovard never said anything about owning part of the property, before or after John Hoover's death.

### Bovard's Attitude Toward Hoover

Marvin Hobbs described John Hoover as a "real nice guy." Curiously, Spencer Bovard described John Hoover in similar terms. When asked by his own counsel about John Hoover, he said, "He was a real good man." Whatever may be said of that, what seems remarkable to us is for Spencer Bovard to so characterize a man who, if Bovard's version is true, had committed a base fraud against him, by conspiring to cheat him out of his interest in the Northwestern lands to the end that he had spent forty years trying to recover what was rightfully his. If true, it is inconceivable that he would refer to the perpetrator of that egregious wrong as "a real good man."

Other weaknesses in the Bovard claim could be cited, but we have belabored the point enough. We are entirely convinced the Bovard trust is specious. We have searched this record for any evidence to document Spencer Bovard's version of the facts. We

find none. The only support for the Bovard trust is the uncorroborated account of Spencer Bovard and, for reasons already discussed, we are unwilling to rely on that without something more substantial than Mr. Bovard's word. It is not that Mr. Bovard failed to keep records. He kept numerous records from the very time these matters were occurring—bank records, hotel bills, receipts for gas purchases, invoices for machinery and tools bought or rented for the mining operation. But we also find records of John Hoover indicating that he was paying these expenses and the most that can be said of Bovard's records is that they point to some common venture involving the Northwestern mine, but fall considerably short of establishing an ownership in the land. In that regard we find nothing.

### Bovard Proof

We have not overlooked the opinion testimony of a handwriting expert that the signature of John Hoover on the Bovard trust was consistent with other, admittedly genuine, signatures of John Hoover. However, the expert conceded readily that it was extremely difficult to determine the authenticity of a signature from a photocopy, as we have here. Beyond that, this signature may actually have been that of John Hoover, obtained by subterfuge. The record contains graphic proof that Spencer Bovard was fully capable of such tactics, even where the interests of a trusting uncle were concerned. Why would he hesitate to use similar ruses against a trusting friend? Bovard admittedly signed Hoover's name to a car title application and does not deny forging Dorothy Bovard's name to a mineral deed, why not the Bovard trust?

We have also examined the affidavits Bovard introduced of Guy Green and his notary public supporting, in some respects, Bovard's position. But Guy Green, according to Bovard, died around 1950[5] and under the exceptional circumstances of this case we attach little credence to unverifiable affidavits, patently inadmissible for that matter, from persons long deceased, when the underlying instrument itself, the Bovard trust, is judged to be spurious.

---

[5] The Green affidavit is dated September 15, 1953.

## Conclusion

We have no doubt that John Hoover and Spencer Bovard had some common plan for the Northwestern mine, and that Hoover may have originally intended to give Spencer Bovard an interest in the property, if for no other reason than because Spencer Bovard provided the opportunity. But that attitude changed for reasons Hoover never explained to either his wife or his daughter. Whether Hoover discovered something about Bovard not to his liking, or whether Bovard was unwilling to rely on John Hoover's good intentions and demanded as his right that which was only his, if at all, by sufferance, we cannot say. We can say unreservedly that the evidence clearly preponderates against the chancellor's finding, and accordingly, we reverse the decree.

The decree is reversed and the suit remanded for further proceedings consistent with this opinion.

PURTLE, J., not participating.

32

## DECLARATION OF TRUST

I, John Hoover, of Kansas City, Missouri, do hereby acknowledge and declare:

That the following described real estate situated in the Greenwood District of Sebastian County, Arkansas, to-wit:

All of Section Nineteen (19); the North Half of the South Half, the Southeast Quarter of the Southeast Quarter, the Southwest Quarter of the Southwest Quarter, and the North Half of Section Twenty (20); the South Half of the Southeast Quarter, and the Southeast Quarter of the Southwest Quarter of Section Seventeen (17); the South Two (2) acres of the Northeast Quarter of the Southeast Quarter, the Southeast Quarter of the Southeast Quarter, the East Half of the Southwest Quarter, the Southwest Quarter of the Southwest Quarter, and the Southwest Quarter of the Southwest Quarter of Section Eighteen (18); the East Half of the Northeast Quarter, The West Fractional Half of the Northwest Quarter, the West Fractional Half of the Southwest Quarter, the West Half of the Northeast Quarter, the East Half of the Northwest Quarter, and the Northwest Quarter of the Southeast Quarter of Section Thirty (30); the East Half of the Northwest Quarter, the East Half of the Southwest Quarter, The East Half of the Northeast Quarter, the West Half of the Northwest Quarter, and the Northwest Quarter of the Southwest Quarter of Section Twenty-nine (29); the North Half of the Southwest Quarter, the Southwest Quarter of the Southwest Quarter, and the South Half of the Northeast Quarter of Section Twenty-one (21); the West Half of the Northwest Quarter of Section Twenty-eight (28); all in Township Four (4) North, Range Thirty-one (31) West.

Also, the East Half of the Northeast Quarter, and the East Half of the Southeast Quarter of Section Twenty-four (4); and the East Half of the Southeast Quarter of Section Thirteen (13); all in Township Four (4) North, Range Thirty-two (32) West.

the title to which is now in my name, is prima held and acquired for the joint benefit of myself, Margaret Piper and Dorothy Howard, each of us having an undivided one-third interest in said property and its natural resources.

Subject, however, to all costs of maintenance and taxes on said property and further subject to the right of indemnification to me either by cash or from any income from the above real estate for all sums I may discharge with reference to indebtedness caused by such costs of maintenance and taxes.

This trust shall continue until the above property is sold by agreement of the above parties and each of us shall share equally in the proceeds of such sale.

IN WITNESS WHEREOF, I have set my hand at Kansas City, Missouri, this 8th day of November, 1946.

*John Hoover*